## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **MURPHY A. JUNAID,** | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **CASE NO. 2:11-cv-226** |
| | § | |
| **JOHN MCHUGH,** | § | |
| **Secretary of the Army** | § | |
| *Defendant* | § | |

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant John McHugh, Secretary of the Department of the Army, respectfully moves to dismiss this action pursuant to Fed. R. Civ. P. 56.

### I. INTRODUCTION

Plaintiff is presently running for Congress in the 34th District of Texas. He was removed from his employment as an Industrial Engineer at the Corpus Christi Army Depot for insubordination, discourtesy towards a supervisor, and making a false statement.

He claims that the Army's disciplinary actions, including two suspensions and his removal, and his non-selection for a supervisory position, were motivated by animus toward his race/color (Black) and national origin (African-American), and in retaliation for participation in prior protected activity.

The claims related to his five-day suspension should be dismissed for his failure to timely exhaust his administrative remedies by initiating contact with an agency EEO counselor within 45 days of the challenged action. Even if the five-day suspension survives dismissal, this Court should grant summary judgment to the Army on it and his other claims.

1

His discriminatory discipline claims fail because he cannot identify similarly situated comparators outside his protected class who were treated more favorably.  His retaliation claims based upon the five-day suspension and his non-selection fail because there is no evidence that he participated in prior activity protected under Title VII at the time of the actions.  His retaliation claims related to his fourteen-day suspension and his termination fail because he cannot show the requisite causal connection between his protected activity and the challenged actions.  In the alternative, all of his claims fail as a matter of law because he cannot rebut the Army's legitimate, non-discriminatory reasons for its actions.

## II.  UNDISPUTED FACTS

### A.      BACKGROUND

Plaintiff was employed as an Industrial Engineer at the Red River Army Depot from February 1985 to November 1989.  In 1989, his employment with the Red River Army Depot was terminated for threatening a supervisor and making false, malicious statements against coworkers and supervisors.  Ex. B, 8:9-10).  He apparently did not disclose that information to CCAD personnel during the hiring process.

Plaintiff was employed at CCAD in November 2001 as an Industrial Engineer, GS-0896-12, in the Industrial Engineering Division ("IED") within the Directorate of Engineering Services.

Ron Howe (Caucasian) was the Acting IED Chief, and Plaintiff's first-line supervisor from January 18, 2009, until Gary Hogg (Caucasian) reported for duty as the new IED Chief. At all times relevant, Plaintiff's second-line supervisor was Kresten Cook (Caucasian), Director, Directorate of Engineering Services.

2

On February 13, 2009, July 16, 2009, and August 6, 2009, Plaintiff requested that the Inspector General investigate the Directorate of Engineering Services and its personnel for alleged improper management practices and contract fraud, and his allegation that Kresten Cook improperly used the insignia of a Professional Engineer. None of these requests alleged discrimination or retaliation. (Ex. D)

Howe, as the Acting IED Chief, scheduled a meeting between Plaintiff and a coworker to address an issue Plaintiff had with the coworker. (Ex. A, 190:25-191:8) At the appointed time, Plaintiff stuck his head in Howe's office where Howe and the coworker were waiting, walked in the doorway, looked around, and then turned around and left, without a word. (*Id*. at 191:9-14.) When Howe went to Plaintiff's office to discuss the matter, Plaintiff became upset and called security, accusing Howe of harassing him. (*Id*. at 192:6-20.)

## B.    5-DAY SUSPENSION - CABINET INCIDENT

On March 26, 2009, during the home team meeting, Howe authorized personnel from a contractor, Knowledge-Based Systems, Inc. ("KBSI"), to move three KBSI filing cabinets to accommodate additional contractor personnel. (Ex. E, 6:13-7:7.) The three cabinets were moved into the office Plaintiff shared with another engineer, Eric Lundgren, and placed next to Lundgren's desk. They did not obstruct Plaintiff's access to his desk or inhibit his ability to perform his job duties. (Ex. B, 18:9-25.)

Coworkers reported to Mr. Howe that Plaintiff appeared agitated that the cabinets were moved into his office without being coordinated through him. (Ex. E, 7:10-18; Ex. F.)

Coworkers also reported that Plaintiff was loud and yelled when questioning coworkers about who authorized placing the cabinets in his office.  (Ex. A, 243:21-244:7; Ex. F.)

Judith Ballard (White), IED Administrative Support Assistant, directed Plaintiff to speak to Mr. Howe about the filing cabinet placement.  (Ex. B, 20:15-20.)  Plaintiff did not speak to Mr. Howe.  (Id. at 21:8-13.)  Instead, he returned to his office and removed the files from the first cabinet in order to move it out of his office.  (Id. at 16:22-24, 18:14-19.)  Coworkers also submitted statements that they witnessed Plaintiff pull files out of the cabinets and put them on an adjoining table where they spilled over onto the floor in disarray.  (Ex. F; Ex. A, 103:2-9; Ex. E, Tr. 7:21-8:2.)

Plaintiff's office mate, Eric Lundgren, notified Ballard that Plaintiff was removing files from the cabinets in order to move the cabinets out of the office.  (Ex. E, 53:9-12.)  Ballard went to Plaintiff's office to try to calm him down.  (Ex. B, 21:2-6.)  She informed him that she directed the file cabinet move.  (Id. at 21:5-7.)  Coworkers reported to Howe that they witnessed Plaintiff loudly tell Ballard that she had no right to change his office space and push her back as he closed the door in her face.  (Ex. A, 103:10-21; Ex. E, 8:3-10.)

On June 5, 2009, Howe proposed that the Army impose a 14-day suspension on Plaintiff for creating a disturbance and for discourtesy related to the March 26 incident.  (Ex. B, 23:14-18; Ex. G.)  Nora Ortiz, Management Employee Relations Specialist, CCAD Civilian Personnel Advisory Center ("CPAC"), requested security presence when Howe notified Plaintiff of the proposed suspension.  (Ex. A, 60:1-18, 274:7-9.)

On July 24, 2009, Cook, the deciding official for the suspension, notified Plaintiff of his decision to reduce Howe's proposal to a 5-days' suspension. (Ex. H.) Plaintiff served his suspension July 27-31, 2009, and he returned to the workplace on August 3, 2009. (*Id.*) On August 27, 2009, the Assistant Deputy Commander for Maintenance Operations denied Plaintiff's request for reduction of the 5-day suspension, finding Cook's decision proper. (Ex. I.)

## C.   NON-SELECTION

On January 23, 2009, the Army issued two vacancy announcements (internal and external) for a Supervisory Industrial Engineer ("IED Chief") position. No applicants were interviewed or selected under these announcements. The vacancy announcement was subsequently amended to require one year of supervisory experience and reposted. (Ex. J, 50:8-51:1.) The Army convened a three member panel to make the selection. Kresten Cook was the selecting official and panel chairperson. (*Id*. at 57:20-20, 58:3.) He chose Marc Gonzales (Hispanic), Chief, Equipment Engineering and Management Division, and Luis Salinas (Hispanic) Chief, Facilities Management Division, as panel members. (*Id*. at 58:3-4, 66:3-8, 98:18-19, 118:20-21.)

The CPAC referred ten applicants to the panel for consideration. (*Id*. at 94:17-18.) The panel members independently ranked the resumes of the referred candidates; eight were interviewed, including Plaintiff and Hogg. (Ex. K; Ex. J, 59:7-8.) The panel members asked each interviewee the same four questions and independently ranked their responses. (Ex. J, 58:5-16, 62:5-8.) Based upon the interviews and resumes, each panel member identified his

5

top three choices for consideration.  Plaintiff was not a top choice of any panelist.  (*Id*. at 62:19-20.)  The selectee was a top choice on all three panelists' lists.  (Ex. K.)  After checking the top three candidates' references, the panel members reconvened and reached a consensus that Hogg was the top candidate.  (Ex. J, 84:22-85:1.)  Kresten Cook followed all applicable regulatory guidelines and directives in filling the supervisory IED chief vacancy.  (*Id*. at 138:20-23.)  The selection process for the supervisory position was consistent with CCAD's standard procedure.  (*Id*. at 136:12-137:4.)

On July 1, 2009, Cook notified Plaintiff that Gary Hogg had been selected for the supervisory position.  (Ex. L.)  Hogg's selection was effective August 3, 2009.  (Ex. M.)

### D.    14-DAY SUSPENSION - HOME MEETING INCIDENT

Hogg was in training August 3-6, 2009, and did not report for duty until the afternoon of August 6, 2009.  (Ex. A,.19:2-8, 97:4-23.)  Howe remained the unofficial Acting IED Chief the morning of August 6, 2009, because Hogg was in Human Resource training and did not take responsibility for the division until approximately 11:00 a.m.  (*Id*.)  Howe attended the August 6, 2009, home team meeting to present recent audit findings within IED and to present safety findings for the week.  (*Id*. at 98:4-99:1.)

The facilitator role at the home team meeting is usually rotated among the employees on a monthly basis, pursuant to a roster created by the IED Chief.  (Ex. A, 185:4-7; Ex. B, 30:1-6.)  Plaintiff was the next name on the roster to facilitate the August 6 meeting.  (Ex. A. 158:7-12.)  Upon arrival, Plaintiff ordered Howe to leave the meeting because he was uninvited.  (Ex. B, 31:8-18; Ex. A, 187:15-17.)  Howe explained that he had information to

share with IED personnel.  (Ex. A, 187:18-21.)  Ballard told Plaintiff that she invited Howe, at Kresten Cook's direction, to attend the meeting.  (Id. at 248:20-249:1.)  Plaintiff called security to remove Howe from the meeting.  (Ex. B, 31:15-18.)  Security contacted Kresten Cook who indicated Howe was properly at the meeting.  (Ex. A, 156:17-18; 160:15-161:2.)

Hogg requested via e-mail to meet with Plaintiff on August 17, 2009, to discuss the August 6 incident as part of his investigation as to what happened at that meeting.  (Ex. A, 30:19-31:9.)  Plaintiff responded that he had a previous engagement with the Deputy Commander and his union representative to appeal his 5-day suspension.  (Id. at 31:15-23.)  Hogg told Plaintiff that the meeting would be short and reiterated that he expected Plaintiff's attendance.  (Ex. N.)  Plaintiff did not show up for the meeting with Hogg.  (Ex. A, Tr. 32:8-14.)

Hogg scheduled a second mandatory meeting for August 25, 2009, with Plaintiff and Nora Ortiz, from CPAC, to discuss the August 6 incident.  (Ex. O.)  Plaintiff did not show up at the appointed time.  (Ex. P.)  On two occasions, Hogg called Plaintiff when he did not show up at the appointed time.  (Ex. A, 106:21-107:2.)  During one call, Hogg asked Plaintiff whether he was going to attend, to which Plaintiff said "no" and hung up.  (Id.)  Plaintiff , accompanied by his union representative, finally met with Hogg and Ortiz on August 31 to discuss the August 6 incident.  (Id. at 33:17-21.)  Plaintiff refused to answer the questions verbally during the meeting, insisting on providing written responses, which he did shortly thereafter.  (Id. at 34:4-21.)

On September 23, 2009, Hogg proposed that the Army impose a 30-day suspension on Plaintiff for insubordination and creating a disturbance related to the August 6 incident. (Ex. Q.)  Plaintiff's response to the proposed discipline was due within five days of receiving the proposal.  (*Id.*)  Kresten Cook granted Plaintiff an extension until October 15, 2009, to respond.  (*Ex. A*, 281:22-282:8.)  Plaintiff did not request a second deadline extension from Cook, (*Id.* at 234:3-6), and made the decision not to submit a response, (*Id.* at 232:3-10).  On December 9, 2009, Cook notified Plaintiff of his decision to mitigate Hogg's proposal and reduce Plaintiff's suspension for the August 6 incident to 14 days.  (*Id.* at 38:23-39:5.)

## E.      REMOVAL FROM FEDERAL SERVICE

On May 13, 2010, the union steward advised Plaintiff that Hogg, who had agreed to excuse Plaintiff from home team meeting facilitator duties, nonetheless was still authorized to assign Plaintiff action register responsibilities in the meetings.  (Ex. E, 12:10-13:20.)

On October 4, 2010, Hogg sent an email to his employees, including Plaintiff, with an attached spreadsheet indicating rotational responsibilities for the IED home team meetings for fiscal year 2011.  (Ex. R.)  On the roster, Hogg assigned Plaintiff the task of maintaining the action register for the month of October 2010.  (*Id.*)  Plaintiff responded at the end of the day via e-mail to all IED staff that he was "absolutely NOT interested in participating." (*Id.*; Ex. E, 17:9-16.)  Hogg responded verbally and via e-mail that the action register roles are assigned duties and that he was expected to perform them.  (*Id.* at 17:20-21:2.)

On October 6, 2010, just prior to the 8:00 a.m. meeting start time, Hogg asked Ballard where Plaintiff was and then left the room to find Plaintiff. (*Id*. at 55:21-23.) At 9:10 a.m., Hogg drafted a Memorandum for Record ("MFR") stating that he went to Plaintiff's office to remind him of the home team meeting and that Plaintiff told him to "get out of my office" and that he had "no interest in participating" in the home team meeting. Hogg told Plaintiff that, as his supervisor, he expected Plaintiff to speak to him in a respectful manner. Plaintiff raised his voice and told Hogg, "You do not get to direct me, I do." Hogg informed Plaintiff that he would be meeting with the Personnel office to consider disciplinary action. (Ex. R; Ex. E, 22:8-24:4.)

That afternoon, Hogg sent an email to Plaintiff notifying him that they needed to meet at 2:00 p.m. on October 7 to discuss the incident. On October 7, Plaintiff responded by sending the following threat and insult via mass e-mail distribution:

> I do NOT know, have any idea or knowledge of what you spoke of. I have NO idea what the heck you meant. Your sight is hateful, you are a bigot, a racist, prejudice and have discriminated against me. There are two EEO cases on my behalf against you pending and wish NOT to appear in your sight for any reason till these cases are resolved. If you do NOT stop harassing me or the CCAD management does NOT separate you and I from the Industrial Engineering Division office, your actions against me will surely lead to a disaster.

(Ex. S.)

At approximately 11:13 a.m. on October 7, Hogg approached Plaintiff in his office and informed him that he had received his e-mail response, but that the meeting was mandatory. As Hogg began speaking, Plaintiff walked around Hogg without uttering a word, and left the office. Hogg directed him to stop but Plaintiff continued walking out the door.

9

(Ex. E, 215:6-21, 216:2-12.)  Thirteen minutes later, at 11:26 a.m., Hogg sent Plaintiff an e-mail summarizing what had occurred and reiterating that the 2:00 p.m. meeting was mandatory.  (Ex. T.)  At 12:11 p.m., Plaintiff responded with another threatening e-mail:

> Repeat, I do NOT know, have any idea or knowledge of what you spoke of. I have NO idea what the heck you meant.  Your sight is hateful, you are a bigot, a racist, prejudice and have discriminated against me.  There are two EEO cases on my behalf against you pending and wish NOT to appear in your sight for any reason till these cases are resolved.  If you do NOT stop harassing me or the CCAD management does NOT separate you and I from the Industrial Engineering Division office, your actions against me will surely lead to a disaster.

(Ex. E, 247:2-8; Ex. T.)

Plaintiff and his union representative appeared for the 2:00 p.m. meeting.  Plaintiff acknowledged that Hogg was his supervisor and that he received the e-mails describing the responsibility assigned to him in the home team meetings.  However, he denied being at his desk when Hogg approached at 8:00 a.m. on October 6.  Plaintiff further told Hogg that his presence in Plaintiff's office was itself an issue.  (Ex. E, 253:1-254:2.)

On October 20, 2010, Plaintiff again failed to attend the home team meeting.  (Ex. E, 32:16-21.)  On October 25, Hogg met with Plaintiff to discuss his absence at the October 20 meeting.  Plaintiff provided no reason for his absence and asked Hogg to show him the regulation stating that the meeting was mandatory.  (Id. at 33:6-24.)

On November 17, 2010, Hogg proposed Plaintiff's removal from federal service based upon his third offense of insubordination, discourtesy towards a supervisor, and false statement related to the events that occurred October 4-7, 2010.  (Ex. U.)

On December 17, 2010, William Braddy, Deputy Commander for Maintenance Operations at CCAD and the deciding official on Plaintiff's removal, conducted a reply meeting with Plaintiff and his union representative. Prior to making his decision, Braddy also considered Plaintiff's 90-page written reply. (Ex. E, 66:10-20.)

On March 14, 2011, Deputy Commander Braddy issued his decision, finding that all of the charges and specifications were substantiated by a preponderance of the evidence and that removal was the appropriate penalty for the misconduct. In rendering his penalty decision, he noted that Plaintiff did not demonstrate remorse nor express any apology and blamed others for his own conduct. He concluded that the 8:00 a.m. meeting Hogg documented in the MFR did occur and that Plaintiff was not truthful. As part of his analysis, Deputy Commander Braddy considered Plaintiff's years of government experience and exceptional performance ratings from 2006 through 2008 as a strong mitigating factor. However, he found Plaintiff's potential for rehabilitation very low in light of the seriousness of the misconduct and the history of two prior similar disciplinary actions. Plaintiff's removal was effective March 14, 2011. (Ex. V.)

## G.    MSPB APPEAL

On April 11, 2011, Plaintiff filed an appeal with the Merit Systems Protection Board ("MSPB"), alleging that his removal was the result of harmful error, discrimination, and retaliation. (Ex. BB.)

On December 16, 2011, the Administrative Judge affirmed the Army's action in Plaintiff's "mixed case" appeal, concluding that the penalty of removal was reasonable under the circumstances. (Ex. CC.)

### III.  FIVE DAY SUSPENSION

The EEOC has promulgated regulations for the acceptance and processing of discrimination complaints in federal employment.  *See* 29 C.F.R. §§ 1614.107(b).  These regulations provide time limits for initiating and processing an EEO complaint.  To initiate informal pre-complaint processing, an aggrieved federal employee must consult with an EEO counselor within forty-five days of the alleged discriminatory event.  *See* 29 C.F.R. § 1614.105(a)(1); *Teemac v. Henderson*, 298 F.3d 452 (5th Cir. 2002).  If the matter is not resolved by informal pre-complaint counseling, the agency must provide notice of the right to file a formal complaint of discrimination.  29 C.F.R. § 1614.105(d).  After receipt of notice, the employee has fifteen calendar days to file the formal complaint.  29 C.F.R. § 1614.106(b).

These rules are not mere technicalities, but integral parts of Congress' statutory scheme of achieving a "careful blend of administrative and judicial enforcement powers." *Brown v. General. Services Admin*., 425 U.S. 820, 833 (1976).  If a federal employee fails to timely notify an EEO counselor, then he has failed to exhaust his administrative remedies, and the Court should dismiss the claim. *See Pacheco v. Mineta*, 448 F.3d 783, 788 (5th Cir. 2006); *Vidal v. Chertoff*, 293 Fed. Appx. 325 (5th Cir. 2008); *Molina v. Vilsack*, 748 F.Supp.2d 702 (S.D. Tex. 2010)(Jack, J.).

Plaintiff's five day suspension commenced on July 27, 2009, and ended on July 31, 2009.  He returned to the workplace on August 3, 2009.

On November 24, 2009, Plaintiff submitted Formal EEO Complaint Number ARCCAD09OCT04786, alleging discrimination and reprisal related to his 5-day suspension

issued July 27, 2009, and his notice of proposed 14-day suspension based upon the August 6, 2009 incident.  (Ex. X.)  The claim related to his 5-day suspension in July 2009 was rejected as untimely.  (Ex. Z.)

On May 11, 2010, the EEOC Office of Federal Operations affirmed the Final Agency Decision dismissing any claims related to his 5-day suspension as untimely, and dismissing his claims related to the notice of proposed 14-day suspension as premature.  (Ex. Y.)

On July 8, 2011, the EEO Commission Office of Federal Operations (EEOC OFO) affirmed the Final Agency Decision finding no discrimination in Plaintiff's non-selection. (Ex. W.)

Any Title VII claims related to Plaintiff's five-day suspension are barred because he failed to contact a Department of Army EEO counselor within forty-five days of the effective date of his suspension.

Plaintiff filed the complaint initiating this civil action on July 8, 2011.  The Department of the Army EEO Compliance and Complaints  Review (EEOCCR) dismissed EEO Complaint Number ARCCAD09DEC05742 upon notice that Plaintiff filed the instant judicial action.  (Ex. AA.)

### III.  MOTION FOR SUMMARY JUDGMENT

**A.    Standard of Review**

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact."  *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007).

When the moving party has met its Rule 56 burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). This burden will not be satisfied by "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

## B. McDonnell Douglas Burden-Shifting

In employment discrimination cases, discrimination under Title VII may be proven "through direct or circumstantial evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 345 (5th Cir. 2007). The Fifth Circuit has held that in cases where, as here, no direct evidence of discriminatory intent has been produced, proof by means of circumstantial evidence must be evaluated using the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 ( 1973). *See Turner*, 476 F.3d at 345; *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004). The McDonnell Douglas test applied to Title VII disparate treatment cases is also applicable to Title VII unlawful retaliation cases. *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000).

Under the modified McDonnell Douglas framework, the Fifth Circuit has stated the test as follows:

14

> [T]he plaintiff must first demonstrate a prima facie case of discrimination; the defendant then must articulate a legitimate, non-discriminatory reason for its decision to terminate the plaintiff; and, if the defendant meets its burden of production, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact either (1) [that] the [defendant] employer's reason is a pretext or (2) that the [defendant] employer's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic.

*Burrell v. Dr. Pepper/Seven Up Bottling Grp.*, 482 F.3d 408, 411-12 (5th Cir. 2007). "Although intermediate evidentiary burdens shift back and forth under [the McDonnell Douglas] framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

To avoid summary judgment, a plaintiff must show "the evidence, taken as a whole: (1) creates a fact issue as to whether each of the employer's stated reasons was not what actually motivated the employer and (2) creates a reasonable inference that race [national origin, or retaliation were determinative factor[s] in the actions of which plaintiff complains." *Grimes v. Tex. Dep't of Mental Health & Mental Retardation*, 102 F.3d 137, 141 (5th Cir. 1996). When, as here, the plaintiff fails to meet this burden, summary judgment is proper.

## C. PRIMA FACIE CASE

### 1. Plaintiff Cannot Establish Prima Facie Discriminatory Discipline Case

In his First Cause of Action, Plaintiff appears to generally allege that he was a victim of disparate treatment on the basis of race/color and national origin when he was disciplined on two occasions, not selected for the IED Chief position, and ultimately removed from

federal service.  Plaintiff offers no direct evidence to support his discrimination claims and, thus, must rely on the McDonnell Douglas burden shifting proof model.  Defendant is entitled to summary judgment on the claims related to the two suspensions and termination because Plaintiff has offered no evidence to support the fourth prong of his prima facie case.

To establish a prima facie case of racial and/or national origin discrimination in employment, an employee must demonstrate that (1) he is a member of a protected class, (2) he was qualified for the position at issue, (3) he was the subject of an adverse employment action, and (4) he was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances.  *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009).

Plaintiff's discriminatory discipline claims fail because he cannot identify similarly situated comparators who were treated more favorably.

Plaintiff cannot meet his threshold burden of establishing a prima facie case of discrimination related to his two suspensions and termination because he cannot satisfy the fourth element – that he was treated less favorably than similarly situated employees outside his protected class, under nearly identical circumstances.  *See Wheeler v. BL Dev. Co.*, 415 F.3d 399, 405 (5th Cir. 2005).  As such, these claims fail as a matter of law.

In order to survive summary judgment, Plaintiff must demonstrate that a "similarly situated" employee under "nearly identical" circumstances, was treated differently.  *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 345 (5th Cir. 2005).  Circumstances are nearly

16

identical when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories. *Lee*, 574 F.3d at 260 (citations omitted). "[C]ritically, the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions." *Lee*, 574 F.3d at 260.

To meet his burden, Plaintiff proffers Hamilton Pabone (24 minutes late), Tom Green (late), and Ken Norman (late) as similarly situated comparators. (Ex. A, 16:23-18:15.)  In contrast, Plaintiff was charged with insubordination, discourtesy to supervisors and making false statements.  Plaintiff's evidence that these coworkers were not punished, or not punished as severely as Plaintiff, for attendance-related issues fails to satisfy his burden to identify similarly situated comparators.  Because the "difference between [Plaintiff]'s conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer," the employees are not similarly situated for the purposes of an employment discrimination analysis. *Lee*, 574 F.3d at 260.  Plaintiff's failure to come forward with probative evidence establishing that his suspensions and termination were motivated by race or national origin entitles the Army to summary judgment on these claims.

### 2.    Plaintiff Cannot Establish a Prima Facie Retaliation Case

In his Second Cause of Action, Plaintiff appears to allege that he was not selected for the IED Chief position, disciplined on two occasions, and removed because he had engaged

in protected activity.  Plaintiff offers no direct evidence to support his retaliation claims and, thus, must rely on the McDonnell Douglas burden shifting proof model.  Defendant is entitled to summary judgment on the claims related the 5-day suspension and his nonselection because Plaintiff has offered no evidence to support the first prong of his prima facie case.  Defendant is also entitled to summary judgment on the claims related to his removal from federal service because he cannot satisfy the fourth prong of his prima facie case.

To establish a prima facie retaliation case, an employee must demonstrate that: (1) he engaged in a protected activity as defined by Title VII; (2) his employer was aware of that activity; (3) he suffered a materially adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action.  *Burlington N. & Santa Fe Ry. v. White*, 584 U.S. 53, 68-69 (2006); *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).

a.    Plaintiff's retaliation claims related to the 5-day suspension and nonselection fail because he cannot show he engaged in protected activity prior to these actions.

Plaintiff cannot meet his threshold burden to establish a prima facie retaliation case related to his five day suspension and nonselection because he cannot satisfy the first prong – that he participated in prior activity as defined by Title VII.  Under Title VII, an employee has engaged in protected activity if he has (1) "opposed any practice made an unlawful employment practice by this subchapter," or (2) "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

18

42 U.S.C. § 2000e-3(a).  Title VII prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color . . . or national origin."  42 U.S.C. § 2000e–2(a)(1).  Thus, to be actionable under Title VII, the activity must be related to discrimination in employment based upon membership in one of the enunciated protected classes.

Plaintiff did not engage in any activity protected under Title VII prior to the Army initiating the disciplinary action resulting in the five day suspension or prior to his non-selection.  Mr. Hogg proposed that the Army suspend Plaintiff for conduct related to the filing cabinet incident on June 5, 2009.  Cook notified Plaintiff of his non-selection on July 1, 2009.  (Ex. L.)  Thus, to establish retaliation, the protected activity had to have occurred prior to July 1.  The record evidence, however, shows that Plaintiff first initiated contact with an EEO counselor on July 13, 2009, alleging discriminatory nonselection for the IED Chief vacancy.  (Ex. W.)  Moreover, to the extent Plaintiff attempts to proffer prior Inspector General complaints in support of his proof burden (Ex. B, 25:25-27:3), such activity, alleging misconduct unrelated to the protections afforded under Title VII, is wholly insufficient evidence of prior protected activity to establish a prima facie retaliation case under Title VII.  *See Bartz v. Mitchell Ctr.*, 2008 WL 577388, *2 (W.D. Tex. 2008) (citations omitted) ("if the conduct complained of by the plaintiff had nothing to do with race, color, religion, sex, or national origin, a retaliation claim cannot be maintained under Title VII.").  Accordingly, summary judgment should be granted to the Army on these claims.

b.     Plaintiff's retaliation claims related to his termination fail because he cannot show the requisite causal connection.

Plaintiff cannot meet his threshold burden to establish a prima facie retaliation case related to his removal from federal service because he cannot satisfy the fourth prong – a causal connection between the protected activity and the adverse employment actions. Temporal proximity between an EEO complaint and an employee's removal can establish the causation prong of his prima facie case.  However, Plaintiff must show that the protected activity and the adverse employment action are "very close" in time.  *Washburn v. Harvey*, 504 F.3d 505, 511 (5th Cir. 2007).  Courts have routinely held that a period greater than five months is insufficient to make a prima facie showing of causation.  *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (three months), *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (four months); *Everett v. Central Mississippi, Inc. Head Start Program*, 444 Fed. App'x 38, (5th Cir. 2011) (5 months insufficient).

Plaintiff's prior protected activity is too remote in time from his removal to establish the requisite causal connection.  Plaintiff filed his last formal EEO complaint on February 5, 2010.  (Ex. Z.)  Mr. Hogg proposed his termination on November 17, 2010.  (Ex. U.)  The passage of almost nine and a half months between Plaintiff's protected activity and the adverse action defeats Plaintiff's proof burden as to causation as a matter of law.  The absence of any evidence in the record showing the requisite causal connection warrants summary judgment in the Army's favor on this claim.

## C.     PRETEXT

Even were the Court to find that Plaintiff met his threshold burden of establishing prima facie discrimination and retaliation cases, which the Army denies, his claims fail because he cannot show the Army's legitimate nondiscriminatory and nonretaliatory reasons were pretext.  "A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'" *Laxton*, 333 F.3d at 578.  "In order to rebut a defendant's showing of legitimate, nondiscriminatory reasons for its actions, [however] '[i]t is not enough . . . to dis-believe the employer.'" *Warren v. City of Tupelo*, 332 Fed. App'x 176, 181 (5th Cir. 2009) (*quoting St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993)).  Rather, "the factfinder must believe the plaintiff's explanation of intentional discrimination."  *Id*.  There is no evidence in the record upon which a reasonable trier of fact could infer that any of the Army's reasons for its actions were pretext for intentional discrimination or retaliation and, therefore, this Court should grant summary judgment in favor of the Army.

### 1.     Five Day Suspension

The Army's proffered reason for suspending Plaintiff for five days – creating a disturbance and discourtesy (first offense) – are legitimate nondiscriminatory and nonretaliatory reasons for its actions.  Plaintiff cannot show that the Army's reasons were false or unworthy of credence as required to survive summary judgment.

The undisputed record evidence shows the veracity of the Army's reasons. Mr. Howe, Plaintiff's supervisor at the time of the filing cabinet incident, testified that he authorized

KBSI to move the filing cabinets during the mandatory March 26 home team meeting that Plaintiff did not attend.  Coworkers reported to Howe that Plaintiff appeared agitated that the cabinets were moved into his office without being coordinated through him, (Ex. E, 7:10-18), and that he yelled when questioning coworkers about who authorized placing the cabinets in his office (Ex. A, 243:21-244:7).  Plaintiff admits that he did not discuss the matter with Howe before moving the cabinets despite both Hogg and Ballard directing him to do so.  Instead, he returned to his office and removed the files from the first cabinet in order to move the cabinet out of his office.  (Ex. B, 16:22-24, 18:14-19.)  Coworkers also submitted statements to Howe that they witnessed Junaid pull files out of the cabinets and put them on an adjoining table where they spilled over onto the floor in disarray.  (Ex. A, 103:2-9; Ex. E, 7:21; Ex. F.)  Finally, coworkers reported to Howe that they witnessed Junaid loudly tell Ballard that she had no right to change his office space and push her back as he closed the door in her face.  (Ex. A, 103:10-21; Ex. E, 8:3-10; Ex. F.)  The decision to suspend Plaintiff for five days was reasonable under these facts.

In his deposition, Plaintiff asserted, without corroboration or otherwise supporting evidence, that the suspension was motivated by race and national origin because he had the right to move contractor property out of his office.  (Ex. B, 24:6-22.)  Plaintiff's subjective belief as to the appropriateness of his actions is not probative evidence and insufficient to survive summary judgment.  *See Moore v. Eli Lilly & Co.*, 990 F.2d 812 (5th Cir.1993) (subjective belief of pretext insufficient to require a jury trial).  Plaintiff's failure to rebut the Army's legitimate reasons for its actions warrants judgment in the Army's favor as a matter of law on the claims related to the five-day suspension.

22

2.        **14-Day Suspension**

Likewise, the Army's proffered reason for suspending Plaintiff for 14-days – insubordination and creating a disturbance (second offense) – are legitimate non-discriminatory and nonretaliatory reasons for its actions.  Plaintiff cannot show that the Army's reasons were false or unworthy of credence as required to survive summary judgment.

Plaintiff does not dispute the facts as documented in Hogg's suspension proposal or in Cook's decision to mitigate the proposal and impose a 14-day suspension.  On the morning of August 6, 2009, Mr. Hogg had not yet assumed the IED Chief duties.  (Ex. A, 97:4-23.)  Mr. Howe, who was Plaintiff's first-line supervisor until 3 days earlier, attended the August 6, 2009, home team meeting to provide ISO Audit insufficiency findings within IED and to present safety findings for the week.  (*Id*. at 98:4-99:1.)  Plaintiff was the meeting facilitator because the assigned coworker was absent.  (*Id*. at 158:7-12.)  Plaintiff ordered Howe to leave the home team meeting because he was uninvited.  (Ex. B; Ex. A, 187:15-17.)  Mr. Howe explained that he had information to share with IED personnel.  (Ex. A, 187:18-21.)  Despite Ms. Ballard telling Plaintiff that she invited Mr. Howe to attend the meeting, (*Id*. at 248:20-249:1), Plaintiff called security to remove Mr. Howe from the home team meeting, (Ex. B, 31:15-18).  The decision to suspend Plaintiff for 14-days was reasonable under these facts, particularly as Plaintiff had returned only three days earlier from a 5-day suspension for similar misconduct.

Plaintiff contends the 14-day suspension was motivated by race and national origin discrimination because he was authorized as Acting IED Chief to call security and because Mr. Cook did not afford him additional time to respond to the proposed suspension. Neither of these contentions is supported by the record. As to the first contention, according to the roster prepared by the IED Chief, Mr. Howe's position for the eight months prior to the August 6 incident, Tom Green was the assigned facilitator, not Acting IED Chief, for the August 6 meeting. Plaintiff was the facilitator only because Mr. Green was absent that morning, and, therefore, the duty fell to the next name on the roster – Plaintiff. (Ex. A, 158:7-12.) With regard to the second contention, the undisputed record evidence shows that Mr. Cook granted Plaintiff an extension until October 15, 2009, to respond. (Ex. A, 281:22-282:8.) However, Plaintiff did not request a second deadline extension from Mr. Cook, (Ex. A, 234:3-6) and made the decision not to submit a response, (Ex. A, 232:3-10). Plaintiff's failure to rebut the Army's legitimate reasons for its actions warrants judgment in the Army's favor as a matter of law on the claims related to the 14-day suspension.

### 3.    Non-Selection

A plaintiff may rebut a defendant employer's legitimate, nondiscriminatory reason, "survive summary judgment, and take his case to the jury by providing evidence that he was 'clearly better qualified' than the employee selected for the position at issue." *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 357 (5th Cir. 2001) (internal citations omitted). Plaintiff maintains that he is clearly more qualified than Hogg because he was already a government employee and Hogg was a contractor at the time of the selection . (Ex. B,

11:4-20; 28:4-29:16.)  However, the fact that Hogg's industrial engineering experience was in the private sector is not probative as to who was more qualified for the IED Chief position. The record evidence shows that Plaintiff had a bachelor's degree in industrial engineering. Hogg had both a bachelor's degree and a master's degree in industrial engineering from Texas A & M – College Station.

The selectee was the better qualified candidate for the IED Chief position.  Plaintiff's subjective belief that he was not selected based upon discrimination or retaliation is insufficient to create an inference of the Army's discriminatory intent.  Indeed, "a subjective belief of discrimination, however genuine, [may not] be the basis of judicial relief." *Lawrence v. Univ. of Tex. Med. Branch at Galveston*, 163 F.3d 309, 313 (5th Cir. 1999). Plaintiff's failure to show that he was clearly more qualified than the selectee, or to identify any evidence suggesting that the Army's articulated reasons for not selecting him for the supervisory position at issue were pretextual warrants judgment in the Army's favor as a matter of law on the claims related to Plaintiff's nonselection for the IED Chief position.

### 4.    Removal

The Army's proffered reasons for removing Plaintiff from federal service – insubordination, discourtesy to a supervisor, and making a false statements (third offense) – are legitimate nondiscriminatory and nonretaliatory reasons for its actions.  *See Aldrup v. Caldera*, 274 F.3d 282, 286 (5th Cir. 2001) (insubordination on three separate occasions sufficient nondiscriminatory reason for removal).  Plaintiff cannot show that the Army's reasons were false or unworthy of credence as required to survive summary judgment.

The undisputed record evidence supports the charge of insubordination.  The union steward advised Plaintiff on May 13, 2010, that Mr. Hogg was authorized to assign Plaintiff action register responsibilities.  (Ex. E, 12:10-13:20.)  On October 4, 2010, Mr. Hogg assigned Plaintiff the task of maintaining the action register for the month of October 2010. (Ex. R.)  Plaintiff responded at the end of the day via e-mail to all IED staff that he was "absolutely NOT interested in participating."  (Id.; Ex. E, 17:9-16.)  Mr. Hogg responded verbally and via e-mail that the action register roles are assigned duties and that he was expected to perform them.  (Ex. E, 17:20-21:2.)  Nevertheless, Plaintiff ignored his supervisor's direction and did not attend the meeting.

The record evidence further shows that Plaintiff's behavior was discourteous and threatening to his supervisor.  Mr. Hogg sent Plaintiff an e-mail that afternoon, notifying him that a meeting scheduled for 2:00 p.m. on October 7 to discuss the incident.  On October 7, Plaintiff responded via mass e-mail distribution:

> I do NOT know, have any idea or knowledge of what you spoke of.  I have NO idea what the heck you meant.  Your sight is hateful, you are a bigot, a racist, prejudice [sic] and have discriminated against me.  There are two EEO cases on my behalf against you pending and wish NOT to appear in your sight for any reason till these cases are resolved.  If you do NOT stop harassing me or the CCAD management does NOT separate you and I from the Industrial Engineering Division office, your actions against me will surely lead to a disaster.

(Ex. S.)

At approximately 11:13 a.m. on October 7, Mr. Hogg approached Plaintiff in his office and informed him that he had received his e-mail response but that the meeting was mandatory.  As Mr. Hogg began speaking, Plaintiff walked around Mr. Hogg without

26

uttering a word, and left the office.  Mr. Hogg directed him to stop but Plaintiff continued walking out the door.  (Ex. E, 215:6-21, 216:2-12.)  Thirteen minutes later, at 11:26 a.m., Mr. Hogg sent Junaid an e-mail summarizing what had occurred and reiterating that the 2:00 p.m. meeting was mandatory.  (Ex. T.)  Junaid responded with an e-mail at 12:11 p.m. stating:

> Repeat, I do NOT know, have any idea or knowledge of what you spoke of.  I have NO idea what the heck you meant.  Your sight is hateful, you are a bigot, a racist, prejudice [sic] and have discriminated against me.  There are two EEO cases on my behalf against you pending and wish NOT to appear in your sight for any reason till these cases are resolved.  If you do NOT stop harassing me or the CCAD management does NOT separate you and I from the Industrial Engineering Division office, your actions against me will surely lead to a disaster.

(Ex. E,. 247:2-8; Ex. T, )  Sending these e-mails, particularly the broad distribution Plaintiff utilized, is threatening and disruptive to the work environment

Finally, the deciding official's determination that Plaintiff gave a false statement when he denied an encounter with Hogg occurred prior to the October 6 home team meeting is supported by the record.  In reaching this decision, Mr. Braddy found the fact Mr. Hogg drafted an MFR on October 6, 2010, at 9:10 a.m., concerning the encounter to be credible evidence that the encounter occurred as Hogg described.  (Ex. V, Ex. R, Ex. E, 22:8-24:4.)  While Plaintiff's government experience and exceptional performance ratings from 2006 through 2008 were strong mitigating factors, Mr. Braddy found removal appropriate because Plaintiff's potential for rehabilitation was very low in light of the seriousness of the misconduct and the history of two prior similar disciplinary actions.  (Ex. V.)  Thus, Plaintiff cannot show that the Army's decision to remove him from federal service was pretext for discrimination based upon his race and national origin, or in retaliation for participation in prior protected activity.

Plaintiff's behavior in refusing to attend the home team meetings as directed by his supervisor was unreasonable and outside the protection of Title VII. A subordinate must obey an order first and complain later, unless doing so would place them in a clearly dangerous situation. *Aldrup*, 274 F.3d 282, 288). When, as here, an employee is unusually combative, otherwise protected conduct may be so disruptive or inappropriate as to fall outside the Title VII's protection. *See Rollins v. State of Fla. Dep't of Law Enforcement*, 868 F.2d 397, 401 (11th Cir. 1989) (To determine the reasonableness of an employee's opposition, other courts have weighed "the need to protect individuals asserting their rights [under Title VII] against an employer's legitimate demands for loyalty, cooperation and a generally productive work environment."). The undisputed relevant evidence of record shows that the Army's actions were not motivated by discrimination or retaliation but, rather, Plaintiff's insubordinate and disrespectful behavior towards his supervisors and his behavior's disruption to the workplace. It was only after efforts to address his unreasonable refusal to follow his supervisor's directives and his repeated discourtesy proved unsuccessful that the Army properly removed him from federal service. Accordingly, this Court should grant summary judgment to the Army on Plaintiff's discrimination and retaliation claims.

## IV. CONCLUSION

For the foregoing reasons, this Court should dismiss Plaintiff's claims related to the five-day suspension in July 2009, grant the Army's Motion for Summary Judgment, and enter a final judgment in the Army's favor on all claims.

Respectfully submitted,

KENNETH MAGIDSON
United States Attorney

By:      /s/ *Charles Wendlandt*

CHARLES WENDLANDT
Assistant United States Attorney
Southern District of Texas No. 12172
Texas Bar No. 21171500
800 N. Shoreline, Suite 500
Corpus Christi, Texas  78401
Telephone:  (361) 888-3111
Facsimile:  (361) 888-3200
E-mail: Chuck.Wendlandt@usdoj.gov
Attorney-in-Charge for Defendant

OF COUNSEL:
ANNETTE T. PERRY
U.S. Army Legal Services Agency
9275 Gunston Road, Suite 3013
Fort Belvoir, VA 22060
Telephone:  (703) 693-1036

<u>CERTIFICATE OF SERVICE</u>

    I hereby certify that on April 5, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to:

Malinda A. Gaul                 malindag@swbell.net
924 Camaron Street
San Antonio, Texas 78212

       /s/ *Charles Wendlandt*

CHARLES WENDLANDT

29