EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742



ORIGINAL                                                              1

1        REPORTER'S RECORD

2        VOLUME 1 OF 1 VOLUMES

3    * * * * * * * * * * * * * * * * * * * * * * * * *

4        ACTIVITY DOCKET: ARCCAD09DEC05742

5    INVESTIGATION INTO THE COMPLAINT OF MURPHY A. JUNAID

6    * * * * * * * * * * * * * * * * * * * * * * * * *

7        IRD FACT-FINDING CONFERENCE

8        MAY 27, 2010

9    * * * * * * * * * * * * * * * * * * * * * * * * *

10   THE INVESTIGATOR:
     MS. LINDA KIRKSEY
11   Department of Defense
     Civilian Personnel Management Service
12   Investigations and Resolutions Division
     P. O. Box 69
13   Copperas Cove, Texas  76522
     Phone:  254.547.8838
14   E-Mail: Linda.Kirksey@cpms.osd.mil

15   AGENCY REPRESENTATIVE:
     MR. KEN MUIR
16   CORPUS CHRISTI ARMY DEPOT - LEGAL DEPARTMENT
     308 Crecy Street
17   Corpus Christi, Texas  78419-5260

18   COMPLAINANTS' REPRESENTATIVE:
     MS. MALINDA A. GAUL
19   LAW OFFICES OF GAUL and DUMONT
     924 Camaron
20   San Antonio, Texas  78212
     Phone: 210.225.0685
21   Fax: 210.320.3445
     E-Mail: gdsa@swbell.net
22

23   On MAY 27, 2010, the following Fact-Finding Conference
     was held in the above-entitled cause before the
     INVESTIGATOR above-named, held at the Corpus Christi
24   Army Depot, 308 Crecy Street, Corpus Christi, Texas
     78419-5260. Proceedings were reported by machine
25   shorthand.

     CALVERT REPORTING SERVICE    361.992.3398   FAX: 992.4247
     POB 271558, CORPUS CHRISTI, TX 78427    1.800.773.0254

EXHIBIT A

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

11

1  will go from there.

2            MURPHY ALADE JUNAID,

3  the witness, having been duly sworn, testified as

4  follows:

5            E X A M I N A T I O N

6  BY INVESTIGATOR LINDA KIRKSEY:

7      Q.   Please state your full name for the record.

8      A.   Murphy Junaid.

9      Q.   Do you have a middle name?

10     A.   A-L-A-D-E.

11     Q.   And, sir, you are aware that your testimony is

12  being recorded and it is being given without a pledge of

13  confidentiality?

14     A.   Correct.

15     Q.   You've had an opportunity to review the Privacy

16  Act.  Do you have any concerns about your rights in this

17  process?

18     A.   No, I don't.

19     Q.   Ms. Gaul is your personal representative?

20     A.   Yes.

21     Q.   Are you okay with continuing?

22     A.   Correct.

23     Q.   Tell me what your current position title,

24  series and grade are.

25     A.   I'm an Industrial Engineer GS-12 Step 6.

12
FFC 05.27.10/M.JUNAID    WITNESS: MURPHY JUNAID    EXAM/INVEST

1      Q.    And my records seem to reflect that you are in

2    series 0896.  Is that correct?

3      A.    0896, correct.

4      Q.    And what organization are you currently

5    assigned to?

6      A.    I work at the Corpus Christi Army Depot,

7    Industrial Engineering Division.

8      Q.    Now, is that part of the Directorate of

9    Engineering Services?

10     A.    Correct.

11     Q.    And how long have you been employed in your

12   current position?

13     A.    Thirteen years.

14           REPORTER:  How long?

15           THE WITNESS:  Thirteen.

16     A.    Are you asking at CCAD or in the Government?

17   Which one?

18     Q.    (BY INVESTIGATOR)  In your current position as

19   an industrial engineer at CCAD.

20     A.    Nine years.

21     Q.    Nine years?

22     A.    Yes.

23           REPORTER:  Can you speak up --

24           THE WITNESS:  Nine years.

25           REPORTER:  -- just a little bit more or --

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

1    Q.    Yeah.   What is your relationship to Mr. Howe?

2    A.    Ron Howe was selected to be a temporary IED

3  Chief when the current IED Chief, Kelly Jackson, moved

4  to another Agency.   So, when Ron Howe was acting

5  temporarily, he acted for almost like eight months.

6  When his time elapsed at the end of July, Mr. Hogg took

7  over on August 3rd, which is Monday, but Mr. Hogg was

8  not present the 3rd, 4th, 5th.

9              And the 6th is when that incident

10 happened.   Mr. Ron Howe was not a member of the IED

11 staff any longer when he came back to our meeting.

12   Q.    And where did he go back to?

13   A.    Went back to under Mr. Kresten Cook.

14   Q.    All right.   Let's talk about what happened.

15 You were proposed for suspension for 30 days.   Is that

16 correct?

17   A.    Correct.

18   Q.    And when I look at the "Proposal" letter, it

19 appears that there were basically two charges:   One was

20 that you created a disturbance, and the other was that

21 you were insubordinate.

22   A.    Yes.

23   Q.    We are going to talk about those separately.

24 Let's talk about creating a disturbance.   We started

25 talking a little bit about what happened on August 6;

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

1  "His voice is threatening."  I'm not threatening.

2            I'm not American.  I'm not from here.  I

3  speak the way I was brought up to speak.

4     Q.   I mean were you angry and upset, agitated?

5     A.   Well, I mean the way I'm speaking now,

6  anybody -- anyone here goes: "Well, he was threatening."

7  "He was angry."  I'm not.  It is just because of the

8  way --

9            I was Nigerian born, I was raised in

10 Nigerian before I came down here, and that is the way my

11 tone sounds like, not that I'm threatening.

12    Q.   Okay.  It appears that Mr. Hogg actually talked

13 to or at least sent a document out to all the various

14 employees that attended the meeting.

15    A.   Correct.

16    Q.   And I'm assuming that you've reviewed all of

17 those.

18    A.   Correct.

19    Q.   Mr. Hogg also wanted to sit down and speak with

20 you as to what happened that day.  What was your issue

21 with sitting down with him?

22            Because it appears in the record that you

23 were scheduled on August 17 to sit down and talk with

24 him and that did not happen, and then you were

25 rescheduled again on August the 25th.  I mean what was

CALVERT REPORTING SERVICE   361.992.3398   FAX: 992.4247
POB 271558, CORPUS CHRISTI, TX 78427    1.800.773.0254

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

31
FFC 05.27.10/M.JUNAID    WITNESS: MURPHY JUNAID    EXAM/INVEST

1  the issue with sitting down and talking with him?

2     A.    Prior to his calling me into a meeting, I had a

3  previous engagement with the Deputy Commander,

4  Mr. Williams, to appear for the first five-day

5  suspension at 2:00 o'clock.

6     Q.    Now, which date are we talking about?  What

7  date was that?

8     A.    It was the day he asked me to come to this

9  meeting.

10     Q.    The 17th?

11     A.    Yes.  That was the date I was supposed to

12  appear with the Union President, Mr. Joe Gonzales, in

13  the Deputy Commander's Office to appeal the five-day

14  suspension.

15          So, when he sent me that E-Mail, I

16  replied: "Listen, I have a previous engagement with the

17  Deputy Commander.  I'm going to the Deputy Commander's

18  Office.  I'm going to be late, so I cannot."

19          And he said: "Well, I directed you to come

20  to the meeting."

21          I said: "Listen, the President of AFG

22  Union and I are going to the Deputy Commander's Office.

23  We cannot."

24          But, unfortunately, the President,

25  Mr. Gonzales, was absent on the base.  I was looking for

CALVERT REPORTING SERVICE   361.992.3398   FAX: 992.4247
POB 271558, CORPUS CHRISTI, TX 78427   1.800.773.0254

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

32

FFC 05.27.10/M.JUNAID   WITNESS: MURPHY JUNAID   EXAM/INVEST

1  him until almost like 2:00 o'clock and I couldn't get

2  him, so I quickly rushed back to the Deputy Commander's

3  Office to inform them that Mr. Joe Gonzales was not in

4  the office. And Mr. Kresten Cook was already in the

5  Deputy Commander's Office that day. He was waiting.

6      Q.   Now, Mr. Gonzales at that point was your Union

7  Representative?

8      A.   Correct. So, he said: "Well, you did not show

9  up in this meeting, so it is insubordination."

10          I said: "I already told you I have a

11  previous engagement with the Deputy Commander and I was

12  looking for the Union Rep during that time to go to the

13  Deputy Commander's Office. I couldn't find him. I

14  can't come to your meeting."

15      Q.   So tell me what happened on August 25 when he

16  asked you to come to a meeting?

17      A.   Probably he didn't ask me for a second time.

18  Probably not. The only time he asked me again was when

19  they said: "Well, we are going to propose a 14-day

20  suspension proposal."

21      Q.   Now, my record shows that on August 25 at 1400

22  hours you had a scheduled mandatory meeting with

23  Mr. Hogg. You were supposed to be present and Ms. Nora

24  Ortiz was supposed to be present in the IED Chief's

25  Office. The record also indicates that apparently

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

33

FFC 05.27.10/M.JUNAID    WITNESS: MURPHY JUNAID    EXAM/INVEST

1   Mr. Hogg tried to locate you.  He did reach you by phone

2   and you hung up on him.

3       A.    Probably that was when I was looking for the

4   President that day, because that was the only occasion

5   he asked me to come to his office and I said "I have a

6   previous engagement with the --"

7       Q.    And that was on the 17th.  There was a second

8   engagement on the 25th.

9       A.    I don't know what that was about.

10      Q.    So you don't have any recollection of receiving

11  an E-Mail message on that particular meeting or that he

12  contacted you --

13      A.    If he sent me an E-Mail, I probably responded

14  back to him.  If I didn't respond back to him, then I

15  didn't get an E-Mail from him.

16      Q.    I will ask Mr. Hogg when we get to him.

17            So you finally did apparently meet with

18  him on August 31st.  Is that correct?

19      A.    Most likely.

20      Q.    And you did appear with your Union Rep?

21      A.    Correct.

22      Q.    And what happened during that meeting?

23      A.    That was when I believe the new proposal -- I

24  believe the date was changed under the proposal.

25      Q.    No, this is August 31st.  This is still

CALVERT REPORTING SERVICE    361.992.3398    FAX: 992.4247
POB 271558, CORPUS CHRISTI, TX 78427        1.800.773.0254

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

34

FFC 05.27.10/M.JUNAID    WITNESS: MURPHY JUNAID    EXAM/INVEST

1  Mr. Hogg trying to figure out what happened on

2  August 6th as it related to your participation before he

3  made his --

4      A.    Okay.  He prepared questionnaires for me to

5  answer.  So, I said: "Listen, I've learned this lesson

6  before."  On the first five-day suspension, which was

7  presented the same way, they asked me a question, they

8  did not write down anything that I said.  Ms. Nora and

9  Mr. Ron Howe just put check marks on the paperwork.

10             I said: "No, I'm not going" -- "If you

11  have questions for me to answer, give it to me in

12  writing, I will put it down in writing and I will give

13  it back to you."

14             Then Ms. Nora Ortiz said: "Are you saying

15  you are not going to answer the questions?"

16             I said: "I didn't tell you that.  I said I

17  want it in writing.  Instead of you asking me, telling

18  me to answer the question, I'd rather put it in writing

19  so it is on record, that what I said is on record, not

20  what you put down, because I learned my lesson the first

21  time."

22             She said:  "Well, it's that way.  Okay?

23  We ask you these questions, but we give you a written

24  question to answer."

25      Q.    Did you, in fact, respond to Mr. Hogg's request

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

35

FFC 05.27.10/M.JUNAID   WITNESS: MURPHY JUNAID   EXAM/INVEST

1   for information?

2       A.    Questions?

3       Q.    Yes.

4       A.    Yes, I did.

5       Q.    Did you provide him detailed responses and

6   records?

7       A.    Correct.  I did.  I gave him the written

8   answers.

9       Q.    When did you respond to him?

10      A.    Within 24 hours or 48 hours.

11      Q.    Yeah, I think I saw that.  I was trying to

12  locate it.  I think it was on or around the 1st of

13  September.

14            All right.  So you were proposed for a

15  30-day suspension?

16      A.    Right.

17      Q.    And the original letter was dated the 23rd of

18  September -- correct -- and it was incorrect.

19            And I will just show you my copy of it so

20  you can confirm that this is, in fact, the letter we are

21  talking about.

22      A.    Yes.

23      Q.    Okay.  And there was an error in the letter --

24      A.    Correct.

25      Q.    -- about your grade.

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

FFC 05.27.10/M.JUNAID    WITNESS: MURPHY JUNAID    EXAM/INVEST

36

```
 1     A.    Correct.

 2     Q.    The letter was reprinted, apparently correcting

 3  it.

 4     A.    Correct.

 5     Q.    My record seems to reflect that you signed for

 6  this letter on October the 1st.

 7     A.    Correct.

 8     Q.    And I will let you take a look at that as well

 9  just to make sure that we are talking about --

10           This is your signature and you signed for

11  it on October 1st?

12     A.    Yes.

13     Q.    How long did you understand, when you signed

14  for the letter, that you had to respond to the proposed

15  disciplinary action?

16     A.    Well, I think it was stated on the bottom,

17  maybe the last paragraph, that it gives me 15 days or

18  so.  I'm not sure exactly.

19     Q.    Well, now, the letter actually says "five

20  days".

21     A.    Yes.  Correct.

22     Q.    Did you, in fact, respond within the required

23  time limit, which would have made it on or around the

24  6th of October?

25     A.    I asked for an extension.
```

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

38

FFC 05.27.10/M.JUNAID    WITNESS: MURPHY JUNAID    EXAM/INVEST

1  that," that does not give me enough time to respond.

2            I asked, I said: "Listen, one, you did

3  not change the date of the proposed -- the first

4  proposed for 30-day suspension.  The second one, that is

5  the second mistake."

6     Q.   I mean that is just a change in date.  And the

7  way the letter reads --

8     A.   If I give you something today and I ask to give

9  you a five-day suspension, if the date was wrong and you

10 bring it back to me tomorrow, that day would --

11    Q.   Okay.  But the letter itself says "within five

12 calendar days of your receipt of this letter,"

13 regardless of what the date is.

14    A.   It takes me time to go to the Union, to ask

15 them a set of questions for my staff to answer, ask the

16 Union a set of questions for the security to answer.  I

17 can't do that in five days.

18    Q.   Okay.  So, basically, you did not respond?

19    A.   Yes, I did not, because the Union Rep told

20 him: "You are breaking the agreement between CCAD and

21 the Union Agreement."

22    Q.   So, we have kind of talked about why Mr. Hogg

23 proposed the action.  So, on December 9, Mr. Cook, based

24 on the record as it was established, sustained the

25 "insubordination" charge and the "creating a

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

FFC 05.27.10/M.JUNAID   WITNESS: MURPHY JUNAID   EXAM/INVEST

1  disturbance" charge, but he mitigated the penalty to 14

2  days.

3      A.   Without my input or the Union input.

4      Q.   Well, you had the opportunity.

5      A.   Yes.

6      Q.   According to the Table of Penalties, the charge

7  of "insubordination" as a second offense carries a

8  penalty ranging from a five-day suspension to removal

9  from the Federal Government.  "Creating a disturbance"

10 carries a range of penalties from a five- to ten-day

11 suspension for a second offense.

12            I mean what do you believe should have

13 been done with regards to the issues?

14     A.   Well, when an employee made a mistake, you are

15 supposed to call that employee into the office and

16 counsel him first or give him a Letter of Reprimand, not

17 just suspend me five days or 30 days for a second

18 offense.

19            You already put out the agreement as if

20 there is no flexibility.  There should be.  If I make a

21 first offense, you are supposed to come into the office

22 and give me a counseling or a Letter of Reprimand.  They

23 did not do that.

24            First offense is a five-day suspension.

25 Second offense is a 14-day suspension.  The intention is

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

60

FFC 05.27.10/M.JUNAID    WITNESS: MURPHY JUNAID    EXAM/MUIR

1      Q.    -- or Ms. Ortiz, the personnelist, called a

2  security guard, what was the date that that happened?

3      A.    On June 29 -- I mean June 5, 2009.

4      Q.    And what document were you just looking at to

5  see that?

6      A.    Department of --

7            MS. GAUL:  The "Decision on Proposed

8  Suspension" notes that he received the "Proposal" letter

9  June 5, 2009.

10           MR. MUIR:  Okay.  Thank you.

11     Q.    (BY MR. MUIR)  So when you received your

12  "Proposal" letter from Mr. Howe --

13     A.    Yes.

14     Q.    -- a security guard was present, called by

15  Ms. Ortiz?

16     A.    Two securities guards with side arms.

17     Q.    Two security guards were called by Ms. Ortiz?

18     A.    Yes.

19     Q.    Now, is that the only day that you are

20  complaining about a security guard being called to be

21  present during a meeting that you had with management?

22     A.    No.  There was a second occasion.

23     Q.    When was the second occasion?

24     A.    When Mr. Kresten Cook was making the decision

25  to send me home for 30 days, two security guards were

CALVERT REPORTING SERVICE   361.992.3398  FAX: 992.4247
POB 271558, CORPUS CHRISTI, TX 78427      1.800.773.0254

000540

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

68
FFC 05.27.10/M.JUNAID   WITNESS: MURPHY JUNAID   EXAM/MUIR

1    A.   Correct.

2    Q.   And, so, you were following Mr. Howe's schedule

3 on that day; correct?

4    A.   Correct.

5    Q.   In looking at the second attachment, right in

6 front of that, where it says on the top "Edited by James

7 Green on July 15" --

8    A.   Correct.

9    Q.   -- what is that document?  Is that the PBL

10 Meeting notes for July 15?

11    A.   Correct.  And if you look at the last statement

12 by Ron Howe --

13    Q.   Hold on, sir.  Okay.  Right next to your name,

14 it says "Murphy Junaid - no."

15    A.   "No."  Correct.

16    Q.   What does "no" mean?

17    A.   During the meeting, the facilitator asks

18 questions -- whether you have any comment to make, maybe

19 on your project, you know, progress of your project.

20 "Do you have anything to say?"  "No, I don't have

21 anything to say" -- just like anybody else.

22    Q.   So you had no comment.  On that day, you had no

23 comment; correct?

24    A.   Yes.  Nothing.

25    Q.   Now, down where it says "Ron Howe" --

CALVERT REPORTING SERVICE   361.992.3398  FAX: 992.4247
POB 271558, CORPUS CHRISTI, TX 78427   1.800.773.0254

000548

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

69
FFC 05.27.10/M.JUNAID    WITNESS: MURPHY JUNAID    EXAM/MUIR

1        A.    Yes.

2        Q.    -- the first sentence says:  "Gary taking over

3    3 August as Supervisor.  Ron will be assisting in

4    transition."

5        A.    Correct.

6        Q.    So that means that Mr. Howe actually said that

7    he would be assisting in the transition.  Is that right?

8        A.    That's what is stated.

9        Q.    Now, would it be fair to say that the first

10   week that Mr. Hogg was a supervisor, the first week of

11   August 3rd --

12       A.    But do you have --

13             MS. GAUL:  Let him finish the question.

14             MR. MUIR:  Can I finish my question?

15             MS. GAUL:  Let him finish the question.

16       Q.    (BY MR. MUIR)  The first week in August,

17   starting with August 3rd, where Mr. Hogg was the

18   supervisor, would it be fair to say that that would be a

19   transitionary time period for Mr. Hogg?

20       A.    I have no idea.  I didn't make the decision.

21       Q.    So, if Mr. Howe was assisting Mr. Hogg the

22   first week of August, would that be --

23       A.    "Transition" means "moving".  It doesn't mean

24   coming to sit on August 6 as a supervisor.  That's the

25   difference between "transition".

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

78

FFC 05.27.10/M.JUNAID   WITNESS: MURPHY JUNAID   EXAM/MUIR

1     Q.   You also mentioned, I think in the beginning,

2  that you have, I guess, 13 years of Federal Government

3  experience and nine years at CCAD?

4     A.   Correct.

5     Q.   And where were the other four years served?

6     A.   Red River Army Depot.

7     Q.   Is it correct that you were fired for

8  threatening a supervisor and making false, malicious

9  statements against coworkers and supervisors at the

10 Red River Army Depot in 1989?

11    A.   That was an allegation.  The same thing

12 happened.  I was employed as a -- with Master's Degree,

13 training 7 to 9 to 11.  I got my promotion 7 to 9.  9 to

14 11, the Director sat on my promotion for six weeks.  I

15 filed an EEO Complaint against him --

16    Q.   Okay.

17    A.   Let me finish.

18    Q.   Hold on.  Answer my question.  You will get a

19 chance --

20         THE INVESTIGATOR:  You brought it up.  Let

21 him finish.

22    A.   You brought it up.  I'm going to explain

23 myself.

24    Q.   (BY MR. MUIR)  Go ahead, sir.

25    A.   He sat on my promotion for six weeks.  I filed

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

80
FFC 05.27.10/M.JUNAID    WITNESS: MURPHY JUNAID    EXAM/MUIR

1  anybody -- not a single thing.  Abuse?  Shoot.

2                MR. MUIR:  That is all I have.

3                MR. JUNAID:  You didn't -- you didn't

4  check my other employment agencies?

5                THE INVESTIGATOR:  Ms. Gaul.

6                MS. GAUL:  Okay.  We will go over it.

7                   E X A M I N A T I O N

8  BY MS. MALINDA GAUL:

9      Q.   Tell me more about this school district that he

10  just mentioned.

11     A.   There is nothing to tell.  I substituted for a

12  few days.  That's all.

13     Q.   Were you hired by them as an employee?

14     A.   Not hired.  Just a substitute.  Just call in

15  and they say:  "Hey, we need a substitute teacher."  And

16  I did that.  That is all.

17     Q.   So his question to you was:  Were you

18  terminated from that school district?

19     A.   I wasn't terminated.  They only call you when

20  you are needed.  You know, if you know anything about

21  substitute teaching, they call you when they need you.

22  That is all.  There was no termination.  There was no

23  employment.

24     Q.   Okay.  Let's talk about your employment.  After

25  you got your Master's Degree, where did you go to work?

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

81
FFC 05.27.10/M.JUNAID    WITNESS: MURPHY JUNAID    EXAM/GAUL

1      A.    Red River Army Depot.

2      Q.    How long did you work there?

3      A.    August of -- most likely February 5, 1985 to

4  11/89, I believe.

5      Q.    Where did you go after that?

6      A.    I went to Dallas and worked for, most likely,

7  Uniden Manufacturing.

8      Q.    How long were you there?

9      A.    Maybe two years.

10     Q.    Where did you go after that?

11     A.    I went to Income & Products and I worked there,

12  I want to say, maybe another two or three years.

13     Q.    Okay.

14     A.    Then I came back to Corpus Christi Army Depot.

15     Q.    Okay.  Now, you had to apply for your position

16  at Corpus Christi Army Depot.  Is that correct?

17     A.    Correct.

18     Q.    And then you were accepted for employment

19  here.  Is that correct?

20     A.    Correct.

21     Q.    And the Corpus Christi Army Depot would have

22  had access to any records at the Red River Army Depot.

23  Is that correct?

24     A.    Most likely.

25     Q.    So, did anybody ever talk to you about the

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

FFC 05.27.10/M.JUNAID    GARY HOGG, JR.    EXAM/INVEST    95

1   responding, that there were elevated voices, that there

2   was hostility between the two individuals.  And at some

3   point, Mr. Junaid had left the conference room and spoke

4   with security, and then after that had returned and the

5   meeting concluded after that.

6            But there had been a rather serious

7   disruption to the meeting because it occurred at the

8   beginning of the meeting and the feedback from most of

9   the people involved was very little came out of that

10  meeting because most of the people were on edge because

11  of the incident.

12    Q.   Now, who normally attends these weekly

13  meetings?

14    A.   PBL's are primarily for our industrial

15  engineering staff to discuss, you know, current

16  business, outlying tasks, and so forth.

17            But they are absolutely open meetings.

18  So, an engineer of mine can bring anybody in or invite

19  anybody in or if anybody has an issue with a project

20  that is being worked in Industrial Engineering, they may

21  appear at the PBL meeting.

22            Contrary to Mr. Junaid's comments earlier,

23  the Industrial Engineering Chief is not the facilitator

24  of the meeting.  That is a revolving schedule that does

25  not relate necessarily to the Acting position for IED

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

97

FFC 05.27.10/M.JUNAID      GARY HOGG, JR.      EXAM/INVEST

1    Q.    -- if someone is not there, it moves down to

2    the next --

3    A.    Everybody moves up.

4    Q.    What did you understand Mr. Howe was there for?

5    A.    Mr. Howe -- and I understand there's some

6    confusion in this.  Mr. Howe was the Temporary IED Chief

7    prior to me taking the position.  He had been acting

8    for, I believe, eight or nine months prior to me taking

9    the position.  So, it had been a long vacancy.  His role

10   at the time that this incident occurred was that he was

11   still acting until I took responsibility of the

12   position.

13          I was in new employee orientation until

14   approximately the 6th.  And, you know, at that point I

15   was planning, in fact, the attend this first meeting as

16   my first action as IED Chief; but because I had further

17   requirements from HR, I was not able to attend.

18          So, at that point, you know, I believe

19   that Ron Howe was still acting because I had not

20   officially come in and assumed duty at my desk; but I

21   don't know the legalities of whether or not he was

22   officially acting or not in that capacity.  I cannot

23   testify on that.

24   Q.    Can you understand why the Complainant was

25   confused, in light of the fact that you had been

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

98
FFC 05.27.10/M.JUNAID      GARY HOGG, JR.      EXAM/INVEST

1   assigned into the permanent position, as to withhold

2   have been the Acting that day?

3       A.    I can understand the confusion.

4       Q.    And what was the purpose of Mr. Howe being in

5   the meeting, to the best of your understanding?

6       A.    From the statements that I got from both

7   Mr. Howe and Ms. Ballard, the two primary things that he

8   had were -- we had just gone through an ISO audit and we

9   had a finding in Industrial Engineering specifically

10  that was a negative finding for Industrial Engineering.

11      Q.    What is an "ISO audit"?

12      A.    The "ISO audit" is basically a compliance

13  audit.  There's a set of business practices that the

14  Depot is supposed to follow.  And the Auditing Team came

15  in and had reviewed documentation of project work for

16  Industrial Engineering and found it insufficient, so we

17  were issued a minor finding.  And Ron Howe was supposed

18  to come in and discuss that issue with Industrial

19  Engineering.

20              He also had another role here.  I don't

21  know if you would call it an official role; but we had a

22  requirement that we had each employee submit safety tips

23  or safety findings.  And Ron Howe maintained the

24  database record of all the safety findings, and, so,

25  every meeting he would present those findings to the

CALVERT REPORTING SERVICE   361.992.3398  FAX: 992.4247
POB 271558, CORPUS CHRISTI, TX 78427    1.800.773.0254

000578

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

99

FFC 05.27.10/M.JUNAID     GARY HOGG, JR.     EXAM/INVEST

1   group or report on what he had received.

2       Q.   Now, where is Mr. Howe now?  What position does

3   he hold?

4       A.   He's a staff position under DES as a Senior

5   Engineer.  I'm not sure of his grade.

6       Q.   Now, to the best of your understanding, did

7   Mr. Howe, in fact, have an opportunity to provide the

8   ISO audit information and safety findings in the

9   meeting?  And if you don't know, that is fine.

10      A.   I'm not certain; but from some of the comments

11  that were received on the questionnaire is -- is that I

12  believe it was abbreviated, that they did not cover all

13  the topics because, again, the meeting was interrupted.

14      Q.   Now, what is your understanding of why

15  Mr. Junaid called security?

16      A.   I don't have any understanding of that.  That

17  was, you know, Mr. Junaid's action and I don't really

18  understand it.

19      Q.   Now, were these CCAD security people?  Were

20  they Base security people?

21      A.   They are Army personnel, CCAD Civilian Service

22  personnel that are stationed in Building 8.  I don't

23  know how many of them -- I believe there are five to six

24  that are stationed in Building 8.

25      Q.   So these are individuals that are called out if

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

103

FFC 05.27.10/M.JUNAID   GARY HOGG, JR.   EXAM/INVEST

1   again, we share a large complex.  His office is a subset

2   of that complex.  He proceeded to drag the file cabinets

3   out of his office area.  He proceeded to pull files out

4   of the file cabinet and put them on an adjoining table

5   where they spilled over on the floor and were

6   disorganized.  The files were part of our KBSI records

7   that we maintain for our work with the Depot.  He

8   dragged them out and left them in an adjoining office in

9   the middle of the floor in disarray.

10          Ms. Ballard came into the office and

11  confronted Mr. Junaid and said something to the effect,

12  you know:  "Murphy, what are you doing?"  And Murphy

13  shouted back at her something to the effect that, you

14  know, they don't have the right to do these changes to

15  his work space.  And he actually pushed the door that

16  enters into the area into Ms. Ballard.

17          At that point, I had three employees that

18  witnessed that action.  I had my employees draft up

19  statements of that incident to give to Mr. Howe just to

20  document the event.  After that point, I wasn't involved

21  anymore.

22    Q.   So you were not involved in any final action?

23    A.   (Nodded.)  The disciplinary action, other than

24  to provide the statements.  I think two or three weeks

25  later we were asked to provide not only statements, but

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

106

FFC 05.27.10/M.JUNAID     GARY HOGG, JR.     EXAM/INVEST

1  some medical issues.

2      A.    That's correct.

3      Q.    You initially, it appears, tried to schedule it

4  for the 17th of August.

5      A.    Without checking my records, but I believe that

6  is correct.

7      Q.    And do you know why the Complainant did not

8  show up?

9      A.    I believe his issue was that he did not have

10  his Union Representative that he had chosen to be

11  present. As I recall -- and I may be confusing dates

12  here because, again, there were about four incidents of

13  this, where I tried to establish this meeting.

14              When I had set the meeting time, I

15  contacted CPAC because I wanted to have a CPAC

16  representative there because it was, frankly, the first

17  time I had gone through what I believed might escalate

18  to an employee action and did not know the process, did

19  not know the procedures, and wanted somebody there to

20  help guide me.

21              Mr. Junaid did not show at the time it was

22  set. I called him on the phone and asked him if he was

23  going to attend. I believe he said "No". I asked him

24  why. He said -- There were two different times I had

25  that conversation. Once he said:  "My Union

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

107

FPC 05.27.10/M.JUNAID      GARY HOGG, JR.     EXAM/INVEST

1  Representative is not here; and, therefore, I will not

2  attend."  The other, he just said "No" and hung up.

3              I contacted or talked to Ms. Ortiz at that

4  time about Union representation and she informed me that

5  Mr. Junaid had no right to a specific Union

6  representative and that as long as the Union was able to

7  provide representation that the meeting could be

8  conducted with that representative.

9              So, I informed Mr. Junaid of that and

10  insisted that he attend the next scheduled meeting.

11     Q.   So you had several difference instances where

12  you attempted to meet with the Complainant.

13     A.   Yeah.

14     Q.   My record seems to reflect that you finally did

15  meet with him on August 31st.

16     A.   I believe that is correct.

17     Q.   Tell me about that meeting.

18     A.   At that meeting, I had presented a list of

19  follow-up questions, because Murphy had provided a

20  written response to the questionnaire that initially

21  came out.  The questionnaires of his as well as the

22  other staff members that were there at the meeting led

23  to a number of follow-up questions that I wanted to ask

24  him regarding the conversations that he had with

25  Mr. Howe and what actions he took during that meeting.

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

156

FFC 05.27.10/M.JUNAID     KRESTEN COOK     EXAM/INVEST

1   in that section at IED?

2      A.   Yes, there are peer industrial engineers in

3   that division.

4      Q.   Do you have any reason to believe that any of

5   the similarly-situated engineers were treated more

6   favorably than the Complainant in the workplace?

7      A.   No.

8      Q.   Let's talk about the disciplinary action, which

9   is primarily what is at issue here.  What was your role

10  in the disciplinary action?

11     A.   I was Deciding Official.

12     Q.   How did you learn of the Complainant's conduct

13  and behavior that was the basis of the proposed

14  suspension?

15     A.   Most of the information was through the process

16  of the Decision Letter that was submitted by Mr. Hogg.

17  I received the phone call that they -- when Mr. Howe was

18  asked to leave the meeting, that we discussed earlier.

19     Q.   Why was Mr. Howe at the meeting, to the best of

20  your understanding?

21     A.   If I recall correctly, he was relaying some

22  safety information and safety tips down to the Team

23  Meeting in Industrial Engineering.  He probably was also

24  doing some work as -- because we were transferring over

25  leadership of that office to Gary Hogg and Mr. Howe was

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

158

FFC 05.27.10/M.JUNAID      KRESTEN COOK      EXAM/INVEST

1  with the Table of Penalties, those kinds of things.

2      Q.    So you basically walked through the Douglas

3  Factors in making your decision?

4      A.    Yes.

5      Q.    Who in Personnel did you work with or Legal

6  Office did you work with?

7      A.    I believe Nora Ortiz was the main person I

8  worked with.

9      Q.    What advice did she give you?

10      A.    Nora helps with, you know, the -- we discuss

11  the case.  She provides me the blank Douglas Factors.

12  We go through them.  We work together in writing the

13  Decision Letter.  But she does not actually give me

14  advice, you know.

15      Q.    Did you actually go through the Table of

16  Penalties and that information as well?

17      A.    Yes.

18      Q.    What made you decide to go from the proposed

19  30-day suspension to a 14-day suspension with regards to

20  the Complainant?

21      A.    Instead of trying to recall it out of my brain,

22  I think the best is the letter itself.

23      Q.    The Decision Letter?

24      A.    The Decision Letter, I can refer to that.

25          THE INVESTIGATOR:  Have you got it?

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

160

FFC 05.27.10/M.JUNAID     KRESTEN COOK     EXAM/INVEST

1  it's the employees of that division, the administrative

2  support, the staff within that division.

3      Q.   In your mind, I mean, would it be unusual for

4  someone that maybe doesn't work in that area to actually

5  come to a meeting?

6      A.   It happens at the directorate level fairly

7  often.  I wouldn't consider it unusual for visitors to

8  come in on division meetings.

9      Q.   Do they have to be invited or do you have to

10  receive any specific notification for them to?

11      A.   No.  As a matter of fact, this is one of the

12  things that the PBL, the Performance-Based Leadership

13  people encourage -- for the Director to go by and visit

14  the different divisions in their Home Team Meetings.

15      Q.   Now, if I understand correctly, you got a call

16  that particular day about a disturbance in this

17  particular meeting.  What did you understand happened?

18      A.   I was on the other side of the Base and I

19  received a call from one of the security personnel and I

20  just got a real quick rundown of what was going on.  He

21  mentioned that Mr. Howe was asked to leave the meeting,

22  and then security was called and they were -- basically,

23  the question was: "Is it okay for Mr. Howe to be at the

24  meeting?"  And I said: "Sure."

25      Q.   So you told security it was okay for him to be

CALVERT REPORTING SERVICE   361.992.3398   FAX: 992.4247
POB 271558, CORPUS CHRISTI, TX 78427     1.800.773.0254

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

161

FFC 05.27.10/M.JUNAID    KRESTEN COOK    EXAM/INVEST

1  at the meeting?

2      A.   Yes, I did.

3      Q.   So, from your understanding, once security

4  informed the Complainant that it was okay for Mr. Howe

5  to remain in the meeting, was he allowed to stay?

6      A.   It was my understanding he was.

7      Q.   Now, there was a comment on the Security Report

8  indicating that there was a history between the

9  Complainant and Mr. Howe.  Do you happen to know what

10 that comment is alluding to?

11     A.   Not exactly what that comment is alluding to;

12 no, I don't.

13     Q.   I will look at it and see if I can give you a

14 little more.  (Perused documentation.)  It is a little

15 unclear to me as to who actually put the comment on

16 there.  It says:  "There's a history between

17 Howe and Junaid."

18              "In the past" -- a Military Police

19 Report -- "a co-worker, Ms. Ballard, reported that

20 Junaid had threatened her because of furniture movement"

21 and stuff like that.

22     A.   Okay.  That's -- I guess that is when Mr. Howe

23 was the Acting Division Chief and that there was a

24 previous incident about moving some files.

25     Q.   Did you actually get involved in that or did

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

185

FFC 05.27.10/M.JUNAID    RONALD GENE HOWE    EXAM/INVEST

1       A.    Yes.

2       Q.    Were you present for that meeting?

3       A.    Yes, I was.

4       Q.    Who normally facilitates those weekly meetings?

5       A.    Normally it is facilitated -- well, the

6   facilitator's job usually rotates amongst the employees

7   on a monthly basis normally.  On that particular

8   meeting, I think Tom Green was the acting -- well, he

9   was like the facilitator for that month.  He wasn't

10  there that day.

11              And I think the next in line was

12  Mr. Junaid to be the facilitator.  I wasn't aware of

13  that until we were in the meeting; but that really

14  didn't have a whole lot to do with anything.

15      Q.    Did you attend that meeting with the intent of

16  leading or facilitating the meeting?

17      A.    No, I did not.

18      Q.    At that point had you relinquished your

19  responsibilities as the Acting Chief?

20      A.    Yes, I had.

21      Q.    Who normally would attend those weekly

22  meetings?

23      A.    Normally it's the entire division or branch.

24  It is a division, in the case of Industrial Engineering.

25  They don't have multiple branches, so it is just the

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

187

FFC 05.27.10/M.JUNAID     RONALD GENE HOWE     EXAM/INVEST

1   information.  We had incurred some shortcomings.  We had

2   some issues that we had to address and I had addressed

3   those issues.  I had discussed it with everyone and we

4   had come up with the fixes for what we needed to do; but

5   I needed to brief everyone, you know, about what

6   happened during the ISO audit and exactly what our

7   corrective actions were, and then what the schedule was

8   for that.

9        Q.   Did the Complainant ask you why you were there?

10       A.   No.

11       Q.   Tell me what happened during the meeting that

12  you recall.

13       A.   Well, when Mr. Junaid came in -- and, of

14  course, he got aggressive immediately, so I moved over

15  to another chair.  He said: "Well, you are not invited.

16  You can't come here because you are not invited to be in

17  here."

18            And I said: "Normally, this is just not

19  the way it is.  And besides that, I work for the

20  Directorate and I need to pass on this information and

21  that is the way it needs to happen."

22            And then he said: "Well, I did not invite

23  you" and "This is my meeting, and, so, you get out of

24  here.  I don't want you here anymore."  And he kept

25  insisting.

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

190
FFC 05.27.10/M.JUNAID      RONALD GENE HOWE      EXAM/INVEST

1  training or something.  He was -- he was just not there
2  that day.
3              He said: "Well, give it to Mr. Hogg and
4  let him" -- you know, "so that he will be aware of what
5  is going on, and then he can look into whether we need
6  to generate some action or not."
7      Q.   Now, did you actually ever talk to security in
8  reference to the issue?
9      A.   I talked to them when they were there in the
10  meeting; but other than -- you know, going down to their
11  office and talking to them, no, I didn't.
12      Q.   So, when security came into the meeting, what
13  did they do?
14      A.   They just basically said:  "What's going on?"
15  And we kind of explained it to them.  And they said:
16  "Well, okay.  We don't see a problem here."
17              And I don't -- I think -- I think they
18  asked Mr. Murphy -- or Mr. Junaid to come out in the
19  hall and chat with them or something.  I don't --  That
20  part of it I don't -- I just don't remember.  I haven't
21  reviewed it or anything, so I don't know.
22      Q.   Have you ever had any other incident between
23  yourself and Mr. Junaid?
24      A.   Well, there's been several issues.  Well,
25  before that happened, we had a meeting.  I know he had

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

191

FPC 05.27.10/M.JUNAID    RONALD GENE HOWE    EXAM/INVEST

1  had an issue with Mr. Tom Green -- and that is when I

2  was still the Acting -- and there was some sort of issue

3  that came up.

4           So, I set up a meeting for Mr. Junaid and

5  for Tom Green to come in and meet with us -- I think it

6  was scheduled for 8:00 o'clock in the morning -- to

7  discuss the issues, you know, so we could get it

8  straightened out.

9           So the morning came of the meeting and Tom

10 Green and I were sitting in my office and we were

11 talking, just in general, just about everything.  And

12 Mr. Murphy came to the meeting; but he walked in the

13 door, he looked around, he turned around and he left and

14 he never came back to the meeting.

15          And Tom Green said, you know:  "What's

16 going on?"  And I said: "I don't know, but let me just

17 see if I can find out and then we will set up another

18 meeting."

19          So, I went to Mr. Junaid's office, which

20 he shares with several other people.  I went to

21 Mr. Junaid's desk and I said, you know: "Murphy, you

22 know, if we don't talk about these things" --

23          Because he never discusses anything with

24 anyone.  He will not talk to you.  He will not answer a

25 question.  When you pass him in the hall, you can say

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

192

FFC 05.27.10/M.JUNAID    RONALD GENE HOWE    EXAM/INVEST

1   "Hello", "Good Morning", whatever you want to do, and

2   he will never -- he acts like you are just not there.

3   And this is not with just me.  This is with a lot of

4   folks -- almost everyone that I know, as a matter of

5   fact.

6                    But he blew up right there.  When I

7   mentioned to him that "We need to talk about this," he

8   got real excited, he left the room, and then he came

9   back in the room and he grabbed his telephone and he

10  called security, and then security came up there.  And

11  then when security came in, they said:  "What is the

12  problem?"

13                   Because he said I was harassing him.  In

14  no way could any of my actions been construed as

15  harassing, you know, because all I was doing, I just --

16  I just mentioned to him that "If we do not talk about

17  these issues, we will never get them resolved."

18                   So, anyway, the security came in and

19  security talked to us both about it, and then they

20  said:  "Look, we don't see a problem here."

21                   And, again, they said:  "We need to talk

22  to Mr. Murphy and get this figured out."  And there

23  again, I don't know exactly what occurred after that.  I

24  know that he went with the security folks and talked to

25  them or something.

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

232
FFC 05.27.10/M.JUNAID    RUBEN ARREOLA, JR.    EXAM/INVEST

1 | little bit later.

2 |    A.    Yeah.

3 |    Q.    So why did the Union decide not to respond at

4 | all?

5 |    A.    Well, it wasn't our decision.

6 |    Q.    Whose decision was it?

7 |    A.    It was his decision.

8 |    Q.    So Mr. Junaid made this decision not to reply

9 | at all?

10 |    A.    Yes, ma'am, because of that, because of that

11 | questionnaire that we were not able to submit and get

12 | statements from the employees that were involved in that

13 | meeting.

14 |         THE INVESTIGATOR:  Ms. Gaul, this was your

15 | witness.

16 |         E X A M I N A T I O N

17 | BY MS. GAUL:

18 |    Q.    The record shows that you requested an

19 | extension of time and were granted a short extension of

20 | time.  Did you make a second request in order to do the

21 | questionnaire?

22 |    A.    Yes.  Because the first one was because of

23 | administrative error.  See?  Because I was going to

24 | throw it out, because how can you take any kind of

25 | action on an employee without the proper administrative

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD08DEC05742

234

FFC 05.27.10/M.JUNAID     RUBEN ARREOLA, JR.     EXAM/GAUL

1              And the response I got back from that,
2    from the second request, was that it was not up to
3    Mr. Hogg.  It was up to Mr. Kresten Cook to decide to
4    give us the second extension or not.
5         Q.   Okay.  Did you go to Mr. Cook then?
6         A.   No, ma'am.
7         Q.   Why not?
8         A.   Because, you know, they won't let us, I mean, I
9    guess, you know.  I mean it was up to him to ask for
10   that extension, I mean.  You know, they took -- I
11   think --
12              I'm not too sure if he answered or not --
13   Mr. Cook; but I think something happened on that
14   E-Mail.  I don't have it in front of me today where I
15   could actually tell you, you know, what was the answer.
16              But because CPAC was involved, there was
17   no -- I couldn't go forward.
18        Q.   Were you at the final meeting where Mr. Junaid
19   got the Notice of Decision on this issue?
20        A.   Yes, ma'am.  I was there when he actually got
21   the Decision and was escorted, I think.  I think that is
22   when they escorted him -- if that's the same one you are
23   asking.
24        Q.   Because Mr. Hogg gave him the proposed action.
25        A.   Right.

CALVERT REPORTING SERVICE   361.992.3398  FAX: 992.4247
POB 271558, CORPUS CHRISTI, TX 78427   1.800.773.0254

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

243

FFC 05.27.10/M.JUNAID      JUDY BALLARD      EXAM/INVEST

1      Q.    Do you know why that is?

2      A.    My opinion is that he is a bully.  And you have

3  to be very careful how you act around him because you

4  can see his demeanor change and you just choose not to

5  have that happen.  So, I just kind of stayed out of the

6  line of fire.

7      Q.    Has that ever happened to you --

8      A.    Yes.

9      Q.    -- when his demeanor has changed?

10     A.    Yes.

11     Q.    When did that happen?

12     A.    We had an incident where he was moving a file

13 cabinet.  And I went into the office because somebody

14 had come to get me.  And my mistake was not in calling

15 security, but going in and asking him to stop moving the

16 file cabinet.  It was heavy and he was moving it by

17 himself.  And I later found out that he had thrown the

18 paperwork out on the floor; but at the time, I didn't

19 know that.  I thought he was just moving it with it in

20 there.

21            But, anyway, he screamed at me and told me

22 to go get the Director.  I told him he was acting like

23 my granddaughter.

24     Q.    So he actually yelled at you?

25     A.    Actually, my granddaughter never acted that

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

244

FFC 05.27.10/M.JUNAID      JUDY BALLARD      EXAM/INVEST

1   bad.  What?

2      Q.   He actually yelled at you?

3      A.   Yes.

4      Q.   What was he upset about?

5      A.   That the file cabinet had been moved into -- by

6   the desk of the person that shares the office with him

7   and that we did not ask his permission.

8      Q.   Who actually directed that the file cabinets be

9   moved?

10     A.   I was in and talking to the contractors and I

11  asked Mr. Lundgren, the one that shares the office with

12  him, if he had a problem with our moving the file

13  cabinet by his desk and he said he did not have an issue

14  with it.

15     Q.   Was it in the Complainant's work space?

16     A.   Well, they shared an office together; but it

17  was an office large enough for more than two employees

18  and it did not restrict the flow of traffic.  There was

19  plenty of room for it there.  I think Eric's comment was

20  it didn't matter if he had a partition blocking the flow

21  of traffic or a file cabinet.  He didn't care what was

22  there.

23     Q.   Was security called that particular day?

24     A.   Not at the time.  Later, because I let my boss

25  know what had happened, that I think Mr. Howe called --

CALVERT REPORTING SERVICE    361.992.3398   FAX: 992.4247
POB 271558, CORPUS CHRISTI, TX 78427    1.800.773.0254

000724

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

FFC 05.27.10/M.JUNAID     JUDY BALLARD     EXAM/INVEST

1  when Ron was no longer -- Mr. Howe was no longer the

2  supervisor and I believe that Mr. Hogg was in training

3  at the time.

4           So, Ron, because Mr. Cook needed Ron to be

5  at the meeting to give us some information, Ron was also

6  going to chair the meeting.  And I was aware that he was

7  going to be chairing the meeting.

8     Q.    Who asked him to chair the meeting?

9     A.    He and I had discussed it.  And he had done it

10 the week before.  And I said: "Well, you are going to

11 be there.  Just go ahead and chair it."

12          Tom Green was actually the one that was

13 the acting -- it was his rotational turn at that time.

14          So Ron was sitting at the head of the

15 table, ready to chair the meeting.  And Mr. Junaid

16 walked in and he goes: "I'm going to do this."  And,

17 so, Ron moved his chair.

18          And then when he started the meeting, that

19 is when Mr. Junaid immediately told him he was to leave,

20 that he wasn't invited.  And I said: "Well, actually, I

21 did invite him.  He is here at Mr. Cook's direction."

22    Q.    So you did speak up and say that?

23    A.    I did.  But I was -- it was very upsetting to

24 me.  And I ended up, because the confrontation continued

25 on with him continuing to insist that Mr. Howe left,

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

249

FFC 05.27.10/M.JUNAID     JUDY BALLARD     EXAM/INVEST

1   that I got up and I left the meeting.

2       Q.   Did you slam the door on your way out?

3       A.   No.

4       Q.   I just heard that a couple of times today.

5       A.   Oh.  Well, if I did, I didn't do it

6   intentionally.  I sure don't recall slamming it.

7       Q.   So why did you leave?

8       A.   It was recent.  It was still fresh with the

9   P.I.I. release and I was having to deal with my requests

10  to get some information released to me, and then him

11  acting --

12           I've -- I've never been in a meeting where

13  I have ever seen anybody act as rudely as he was acting

14  to Mr. Howe.  It was just -- I have been out here 30

15  years and I have never seen behavior as horrible as what

16  I was witnessing.

17           So, in addition to what I was already

18  going through, it was just extremely upsetting.  So, I

19  walked out and I was trying to decide whether to call

20  security myself, so I went down to the Director's Office

21  and I had Mr. Cook's secretary call him on his cell

22  phone and I was explaining to him what was going on when

23  security walked into his office.  And it took me by

24  surprise and I go: "Oh, securely is already here," and I

25  hung up with him.  And I said -- I didn't even ask them

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

274
FFC 05.27.10/M.JUNAID        NORA J. ORTIZ        EXAM/INVEST

1    Q.   And how long have you been in that position?

2    A.   Since 2005.

3    Q.   And what organization are you currently

4    assigned to work out of?

5    A.   Civilian Personnel Advisory Center, Corpus

6    Christi Army Depot.

7    Q.   And just kind of briefly tell me what it is you

8    do in your position.

9    A.   I'm a Management Employee Relations Specialist

10   and provide advice to the managements regarding

11   disciplinary actions and any labor or negotiation issues

12   that come up.

13   Q.   And who do you report to directly?

14   A.   My immediate supervisor is Brenda Thomas.

15   Q.   And how long have you worked for Ms. Thomas?

16   A.   She's been my supervisor for approximately

17   three years.

18   Q.   And who is your second-level supervisor?

19   A.   Cynthia Mizes.

20   Q.   And how long have you worked for Ms. Mizes?

21   A.   Probably about the same amount of time, about

22   three years.

23   Q.   How do you know the Complainant in this case,

24   Mr. Junaid?

25   A.   Mr. Junaid works in the Directorate for

Case 2:11-cv-00226   Document 29-2   Filed in TXSD on 04/06/12   Page 43 of 44

1    A.    The date that we start counting for the reply

2  period is the date that he signs acceptance of the

3  letter.  So, we don't count until the date that he

4  actually signed and acknowledged receipt of that letter.

5    Q.    Do you recall having any discussions either

6  with the Complainant or his representative about some

7  information that they wanted to gather in order to make

8  Mr. Junaid's reply to that proposed action?  Do you

9  recall?

10   A.    Normally when I get a request for information

11  for the case file, they just send it.  They don't

12  normally talk to me.  They either send it by E-Mail or

13  send it on a Union form with a Union heading on it.

14   Q.    If I can tell from a tracking prospective, it

15  appears that the Complainant signed for the letter on

16  the 1st of October.

17   A.    Okay.

18   Q.    With the letter being five days notice to make

19  that response, that would have made it on or around the

20  6th of October.

21   A.    M'hmm. (Nodded affirmatively.)

22   Q.    It appears that he did, in fact, get an

23  extension of time to respond until the 15th of October.

24  Do you recall that?

25   A.    Yes, I do recall that.

EEO Investigation Case File
Murphy A. Junaid v Dept of the Army
ARCCAD09DEC05742

282
FFC 05.27.10/M.JUNAID          NORA J. ORTIZ          EXAM/INVEST

1      Q.   Okay.  Who made the decision to extend the
2   time?
3      A.   The request for -- and, in fact, it is posted
4   as part of the letter.  Mr. Junaid was told on the
5   letter -- and I don't recall which paragraph it is, but
6   it is towards the end of the letter -- that any requests
7   for extension are made to the Deciding Official.  So,
8   the request for extension was made to Mr. Cook.
9      Q.   So the only thing that you would have been
10  informed of is if he wanted to review the file.
11     A.   Well, normally what happens is the Deciding
12  Official will call me and tell me that "I have a request
13  for an extension.  Do you think it is okay?"
14          And I usually tell them: "You are the
15  Deciding Official.  If you feel it is okay to grant it,
16  go ahead and grant it and, if it is reasonable, we can
17  move forward with that."
18     Q.   It appears in this particular case that the
19  Complainant was, in fact, granted an extension until the
20  15th of October.
21     A.   Okay.
22     Q.   Okay?  Do you remember or do you have any
23  recollection of receiving any further requests for
24  extension --
25     A.   None.

CALVERT REPORTING SERVICE   361.992.3398  FAX: 992.4247
POB 271558, CORPUS CHRISTI, TX 78427      1.800.773.0254