ORAL DEPOSITION OF MURPHY A. JUNAID

## Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
 2                 CORPUS CHRISTI DIVISION
 3   MURPHY A. JUNAID,            *
           Plaintiff,             *
 4                                *
     VS.                          *  CIVIL ACTION NO.
 5                                *  C-11-226
                                  *
 6   John McHugh, Secretary,      *
     DEPARTMENT OF THE ARMY,      *
 7         Defendant.             *
 8
 9
10
                      ORAL DEPOSITION OF
11                    MURPHY A. JUNAID
                  TAKEN ON FEBRUARY 29, 2012
12
13
14
15        ORAL DEPOSITION OF MURPHY A. JUNAID, produced as
16   a witness at the instance of the Defendant, and duly
17   sworn, was taken in the above-styled and numbered
18   cause on the 29th day of February, 2012, from
19   10:01 a.m. to 11:07 a.m., before Teresa Anderson,
20   Certified Shorthand Reporter 4944, in and for the
21   State of Texas, reported by machine shorthand, in the
22   United States Attorney's Office, One Shoreline Plaza,
23   800 North Shoreline Boulevard, Suite 500, Corpus
24   Christi, Nueces County, Texas 78401, pursuant to the
25   Federal Rules of Civil Procedure.
```

## Page 2

```
 1              A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
 4        MS. MALINDA A. GAUL
          GAUL AND DUMONT
 5        924 CAMARON STREET
          SAN ANTONIO, TEXAS 78212
 6
 7   FOR THE DEFENDANT:
 8        MR. CHARLES WENDLANDT
          UNITED STATES DEPARTMENT OF JUSTICE
 9        SOUTHERN DISTRICT OF TEXAS
          ASSISTANT UNITED STATES ATTORNEY
10        ONE SHORELINE PLAZA
          800 NORTH SHORELINE BOULEVARD, SUITE 500
11        CORPUS CHRISTI, TEXAS 78401
12
13
14
     ALSO PRESENT: MS. ANNETTE PERRY, UNITED STATES
15                 ARMY LEGAL SERVICES
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1                I N D E X
 2                                          PAGE
 3   APPEARANCES . . . . . . . . . . . . . . .  2
 4
 5   EXAMINATION OF MURPHY A. JUNAID
 6        BY MR. WENDLANDT . . . . . . . . . .  4
 7        BY MS. GAUL . . . . . . . . . . . . . 43
 8
 9   CHANGES AND SIGNATURE . . . . . . . . . . 45
10   REPORTER'S CERTIFICATE . . . . . . . . . . 47
11
12
13                E X H I B I T S
14   NO.     DESCRIPTION               PAGE
15   1       E-MAIL . . . . . . . . . . 37
16   2       E-MAIL . . . . . . . . . . 37
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1              P R O C E E D I N G S
 2            THE REPORTER:  This is the deposition
 3   of Murphy A. Junaid, taken at United States Attorney's
 4   office, One Shoreline Plaza, 800 North Shoreline,
 5   Suite 500, Corpus Christi, Texas 78401.  The time is
 6   approximately 10:01 a.m.
 7            My name is Teresa Anderson, here on
 8   behalf of Sunbelt Reporting.
 9            If Counsel would please state their
10   appearances on the record.
11            MR. WENDLANDT:  Charles Wendlandt for
12   the Secretary of the Army.
13            MS. GAUL:  Melinda Gaul for Murphy
14   Junaid.
15            MS. PERRY:  Annette Perry, U.S. Army
16   Legal Services Agency for defendant.
17            E X A M I N A T I O N
18            MURPHY A. JUNAID,
19   Having been first duly sworn, testified as follows:
20   BY MR. WENDLANDT:
21        Q.   Mr. Junaid, would you please state your name
22   for the record, please?
23        A.   My name is Murphy Junaid, M-u-r-p-h-y,
24   J-u-n-a-i-d, Junaid.
25        Q.   Would you describe your family?  Do you have
```

Pages 1 to 4

ORAL DEPOSITION OF MURPHY A. JUNAID

### Page 5

1 a spouse or children?
2    A.   Well, I was married a while back, but that
3 was -- I have a son, and his name is Murphy A. Junaid
4 also.
5    Q.   Anyone else?
6    A.   I have a nephew in Houston, Texas.
7    Q.   Would you describe your employment history,
8 please?
9    A.   Well, I went to University of Oklahoma, and
10 I graduated in 1980. Moved down to -- went to
11 Georgia. I worked for a few months and went back to
12 college for my graduate school, studied at the
13 Oklahoma State University, and then traveled to
14 Eastern State University in Commerce, Texas, now
15 A&M-Commerce. Got my master's in economics. When I
16 finished, I started working at the Corpus Christi Army
17 Depot -- I mean -- I'm sorry -- Red River Army Depo,
18 Texarkana, Texas, '85 through '89.
19             I left down there, moved down to Texas.
20 I worked for Unity Manufacturing Company in Garland,
21 Texas. Then I moved from there. I worked for Inca
22 Metal Products in Lewisville, Texas, for a while.
23 Then I moved down to Corpus Christi to work for the
24 Corpus Christi Army Depot.
25    Q.   Prior to your work at Corpus Christi Army

### Page 6

1 Depot, were you subjected to any disciplinary action
2 by past employers?
3    A.   Well, the only one that I have was at the
4 Red River Army Depot. I was employed there with -- as
5 a GS7 training to 11, so when my production -- when my
6 promotion was due for Seven, July, I got it. When it
7 was due for 11, the director then -- I believe his
8 name is Juby (ph) Alexander -- delayed my promotion
9 for no reason, so I went to his office to ask why.
10 And he has no reason for me. So I went to EER, file a
11 complaint against him. And I guess they told him
12 to -- what you call it, do my promotion, so he did.
13 So I was promoted to 11.
14             During that period, he said I
15 threatened him. So he went to see the -- in personnel
16 office, complained that I threatened him. And I said,
17 What did I do? I just came to your office, asked you
18 why you didn't promote me when my promotion was
19 supposed to be seven to nine, up to 11. Why are you
20 promoting all this behind me? So he tried to remove
21 me from office. Then I find something against him. I
22 caught him kissing one of the staff in a room, in the
23 office, and I went and complained against him.
24             So I was removed from the office. I
25 filed a complaint. They said, Well, we'll give you

Pages 5 to 8

### Page 7

1 six months, what you call it, preference payment. And
2 I said I didn't want any -- I want my job back. I
3 didn't do anything wrong. So I went to, I guess,
4 appeal, you know. I was denied. A few months later
5 or a few years later he was dismissed, also, from the
6 office. So that's the only discipline that I had
7 before.
8    Q.   Were you -- you wrote a letter -- certified
9 letter to your supervisor's wife, didn't you?
10    A.   Well, I wrote -- well, when I caught him
11 kissing -- I mean, I said, Listen, your husband was
12 married. He was married. He has children that time,
13 and then he was kissing a staff and promoted staff to
14 GS11 without any degree. So I said, Well, this is
15 illegal. So I went to the office. I complained, and
16 I wrote a letter to his wife against him. Depot
17 called him, and they released him also. They fired
18 him after a while.
19    Q.   What was the discipline that was imposed at
20 the Red River Army Depot?
21    A.   There was no discipline. I was just -- they
22 said, well, I threatened him.
23    Q.   You were -- you were --
24    A.   He didn't have any -- you know, any -- I
25 guess, any written support, anything that I said to

### Page 8

1 threaten him. He just said threatened him, all
2 saying, when a black person, you know, talks with
3 white person, he said, Well, he threatened me, and I
4 was afraid, you know. That's what he did. He didn't
5 have any -- you know, he has no support, no evidence.
6 So they said, Well, just believe him, you know, rather
7 than what I said to them. So I was run from the
8 office.
9    Q.   You were fired at the Army Depot, right?
10    A.   Yes.
11    Q.   Did you file any type of appeal to the --
12    A.   I just told you -- I did. I filed
13 complaint. I filed EEO complaint. I went to the -- I
14 file a court -- you know, I went to court that time.
15 Well, that time, since I was, you know, just, I guess,
16 what you call a novice to the system, I didn't know
17 how to go through -- about filing court -- you know,
18 going to court. I didn't have money that time. I
19 wasn't prepared. So when I filed an appeal, an appeal
20 was denied, so I just let it go.
21    Q.   Prior to your employment at the Corpus
22 Christi Army Depot, were you ever accused of
23 threatening violence in the workplace?
24    A.   No, no, never.
25    Q.   In the lawsuit that you've filed concerning

ORAL DEPOSITION OF MURPHY A. JUNAID

## Page 9

1  your -- concerning the Corpus Christi Army Depot,
2  you're alleging discrimination and retaliation -- is
3  that correct?
4      A.  More than that.  Discrimination,
5  retaliation, reprisal, retribution against
6  whistleblowing.  That's my complaint.
7      Q.  In this lawsuit?
8      A.  Yes.  That's -- I mean, my attorney might
9  not put it out, you know, correctly, but that's what
10  I'm claiming here, retaliation, discrimination against
11  whistleblowing.  That's my case.  That's what I'm
12  going to the jury for.
13      Q.  You're -- you're expecting to take your
14  whistleblower case to the jury?
15      A.  Correct.  I'm going to expose every single
16  one of them in the court.
17      Q.  Okay.  So this is a whistleblower case and
18  what else?
19      A.  Reprisal, retaliation, against complaint --
20  you know, for filing complaint against them, because I
21  reported them to the inspector general, as the law
22  says.  In the office I went -- I produced documents
23  more than three occasions with supporting evidence to
24  the inspector general, Mark Wright, of Corpus Christi
25  Army Depot for fraud, cheat, falsifies record against

## Page 10

1  Christian Cook, Ron Howe, Gary Hogg.  It's not just
2  removing from the office.  It's whistleblowing.
3      Q.  So you're complaining about a whistleblower
4  claim in retaliation?
5      A.  Right.
6      Q.  And discrimination?
7      A.  Correct.
8      Q.  Okay.  Now, with respect to your retaliation
9  claim, what was the protected activity that you assert
10  that you engaged in prior to your retaliation claim?
11  In other words, what is your foundation for your --
12      A.  When you find -- when you produce
13  documentations, how you take it the inspector general
14  office, as the law says, that when you see a
15  wrongdoing by an employee of the government, report it
16  to the inspector general office, and so I did.
17          When Christian Cook found out and he
18  was interrogated by inspector general, he found out
19  that I reported him to the inspector general.  So what
20  did he do?  He went after me to find -- to make sure I
21  was removed from the office.
22      Q.  Okay.  So you're retaliation claim is based
23  on your whistleblower claim?
24      A.  Whistleblower, correct.
25      Q.  Okay.  Is it based on anything else, besides

## Page 11

1  your whistleblower claim?
2      A.  Well, discrimination, because I filed a
3  promotion to supervisor position as a GS13, okay.
4  My -- my performance previous was excellent throughout
5  my nine years in service at Corpus Christi Army Depot.
6  Christian Cook selected a contractor of Knowledge
7  Business System Incorporation, KBSI, supervisor who
8  never had one single minute to serve in the federal
9  government.  Selected him over employee with 10, 15,
10  25 years of experience in the federal government.
11  Christian Cook selected him to supervise the same
12  office.  That's -- was awarding contract to that
13  supervisor over employees' experience.
14          And I filed discrimination.  I said,
15  No, that is not correct.  You cannot select a
16  contractor who never saw one day in service in the
17  federal government, even unactive service, over
18  employee who's 10, 15, 25 years' experience as a
19  supervisor with excellent performance, and I filed
20  discrimination case against him.
21          MR. WENDLANDT:  I need to take a break
22  for just a second.
23          MS. GAUL:  Okay.
24          (Brief recess taken.)
25      Q.  (BY MR. WENDLANDT) All right.  To go over

## Page 12

1  this one more time, you're saying that this -- you are
2  alleging a whistleblower case in this lawsuit; is that
3  correct?
4      A.  I am completely, hundred percent sure.  I
5  am -- I am -- say that in the court of the jury.  The
6  jury will hear the whole case from the beginning to
7  the end.
8      Q.  Mr. Junaid, I don't hear very well.  I --
9      A.  Want me to speak louder?
10      Q.  Well, I have --
11      A.  I mean, if I scream -- people will say I
12  scream because of accent, and that's what they say.
13      Q.  I have a problem with my -- what they call
14  Eustachian tubes.  I get pressure in there.  It's hard
15  for me to hear sometimes.
16      A.  Okay.
17      Q.  So as I'm understanding your testimony, you
18  are relying on the whistleblower statutes?
19      A.  My case will be -- start with whistleblowing
20  case against Christian Cook, Ron Howe, and Gary Hogg.
21  Those are the three officials in Corpus Christi Army
22  Depot that were involved in my removal from the
23  office.
24      Q.  Okay.  Are you alleging a claim under
25  Title 7 of the Civil Rights Act?

Pages 9 to 12

ORAL DEPOSITION OF MURPHY A. JUNAID

### Page 13

1  A.  Yes, I am.
2  Q.  All right.  Are you asserting retaliation
3 under Title 7?
4  A.  I am.
5  Q.  All right.  What is the previous protected
6 activity that you are alleging is the basis for your
7 subsequent retaliation claim?
8  A.  Well, that might be part of the law.  I'm
9 not a law student.  I'm a engineer by profession.  You
10 state -- you ask me to quote the law for you.  I do
11 not study law in school.  I studied engineering and --
12 and economics.  If you explain -- if you go to -- if
13 you go through the federal system, there's a quote
14 that says, Under Protection Act, whatever they call
15 it, if an employee sees a wrongdoing inside of a
16 government office, the employee should report.  It's
17 protected under the Whistleblower Act, whatever that
18 is.  Go and report to the inspector general office.
19 We want to see what you find wrong.
20    And I did, with supporting
21 documentations, not once, not twice, but at least
22 three times to the inspector general office at Corpus
23 Christi Army Depot.  All I got back from them was a
24 letter stating, you're a third party.  You're not
25 supposed to be informed about what's going on.

### Page 14

1 Nothing happens against these officials.
2  Q.  Okay.  That's the protected activity?
3  A.  (Witness indicates by nodding.)
4  Q.  Is that correct?
5  A.  It is, because I was protected on that part
6 of -- the IG part, it says.  Fear -- there's something
7 called, Fear or -- No Fear Act, law.  That's --
8 protects whistleblower from being retaliated against
9 with or getting prosecuted against by any government
10 official after reporting to the inspector generals.
11  Q.  Okay.  Now, approximate -- when did -- when
12 did you take that action?
13  A.  I call it.  At least -- right now I do not
14 have my documents with me, but there's case in
15 inspector general's office with my report, most likely
16 starting from probably 2000, if not '8 or '9, most
17 likely, that I went to the IG's office, reporting
18 incident and incident and incident with supporting
19 documents -- not just hearsay, supporting documents,
20 signatures, dollar value in these -- on these cases
21 that I went -- I reported to them.
22  Q.  Now, I understand that you shared an office
23 with Eric Lundgren; is that correct?
24  A.  Correct.
25  Q.  How long did you share an office with

### Page 15

1 Mr. Lundgren?
2  A.  I don't remember when Eric came back from
3 Germany, but at least we spent, I'd say, minimum, two
4 years, most likely, if not more.
5  Q.  Did you get along with Mr. Lundgren?
6  A.  Oh, we are friends.  Helped me move when
7 his -- you know, I don't want to -- he had a problem
8 with his wife.  I went in, packed his stuff to his
9 apartment, moved out of his house to an apartment.
10 We're friends.
11  Q.  Now, was -- was this an area that was
12 partitioned off, or was it an actual, enclosed office
13 room?
14  A.  Our office is in that -- inside an office,
15 but -- and our office is open to both office.  But we
16 have it closed, though, inside other office.  So our
17 office inside another office, and we have it closed
18 off.
19  Q.  So there was a closed door?
20  A.  In our office, from the outside office.
21  Q.  So I understand at some point you were --
22 had left the office, and you returned to find that the
23 filing cabinets had been moved in the office and
24 placed by Eric's desk; is that correct?
25  A.  As an engineer, my job, like any other

### Page 16

1 engineer, is to prepare economical analysis, write
2 specification, and procure and install system on the
3 base.  Every time an engineer writes a specification,
4 it is written that contractor's property must be
5 removed from the federal government property area to
6 differentiate between government property and
7 contractor's property.  Okay.  But contractor move the
8 three cabinets into federal government office, in
9 violation of that system -- that's contractor must
10 separate their property from the federal government
11 property, not to -- not to influence the federal
12 government office.
13    There are three contractor's
14 cabinets -- were put in our office without either
15 asking me or asking Eric Lundgren, because I got
16 e-mail from Eric Lundgren.  Says, Nobody, KBSI,
17 supervisor, nor the supervisor at that time, Ron Howe,
18 asked him whether to relocate those three cabinets in
19 those offices, and none of them even asked me either.
20  Q.  All right.  So the answer to the question is
21 yes.  What I --
22  A.  Yes, when I saw three contractors' cabinets
23 in our office -- which is against law -- I moved one
24 out, because it was against the law.
25  Q.  So my question was, you returned to your

Pages 13 to 16

ORAL DEPOSITION OF MURPHY A. JUNAID

## Page 17

1 office to find it -- find filing cabinets had been
2 moved into the office and placed by Eric's desk, and
3 your answer to that is yes; is that correct?
4      A.   No, filing cabinets -- contractors' filing
5 cabinets. There's a difference. If it's government's
6 filing cabinets, that's okay. There's no reason for
7 me to move it. But it's a contractor, contractor
8 cabinets moved in the federal government office, which
9 is against law. And I moved one out -- out of the
10 three. Yes, I moved one out, but it's not just any
11 cabinets. It's contractor's cabinets, KBSI cabinets.
12      Q.   All right. Which law was violated by that?
13      A.   Because, as I said --
14      Q.   No, my question was, what law --
15      A.   I don't know which law might be, but in
16 every government specification written to be out, as a
17 contractor -- there's always contracting office
18 saying, You must put statement in that -- in your
19 specification that when a contractor comes to the
20 federal government base, he must separate his property
21 from the government property in a separate location
22 provided by that project engineer.
23      Q.   So the answer is you don't know whether
24 there is actual law, do you?
25      A.   There is -- there is a law. I just told

## Page 18

1 you, I'm not a law expert. I'm not a law degree. I'm
2 an engineer, and I've written specification for almost
3 15 years for the federal government, and it's listed
4 in every specification written to be signed to be
5 contracted out. If the contracting office does not
6 get that statement, they will not contract -- they
7 will not award a contract if it's not in that
8 specification. It will not be awarded.
9      Q.   All right. How many cabinets were there
10 that were moved?
11      A.   Three. They moved three in. I just moved
12 one out.
13      Q.   And what size cabinets were these?
14      A.   They are heavy, so I couldn't move -- what I
15 did was I opened each cabinet, each drawer. I moved
16 it first out. I placed it on the table. Then I used
17 roller to move the empty cabinet out and then went
18 back and replaced all those files back in the
19 cabinets, because they're too heavy.
20      Q.   Before you moved them, were they obstructing
21 access to your desk?
22      A.   They were not obstructing access to my desk,
23 but they were in my office, as a government official.
24 They were -- they are contractor's cabinets in the
25 federal government office. I was employed as a

## Page 19

1 federal government office, and the law says you must
2 separate contractor's property from the government
3 office. If you don't want to know, ask the contractor
4 in the office. They are -- you must put a statement
5 in your -- you know, in your specification. I'm not
6 just coming along with this for my -- it is written
7 that you -- in every contract to be awarded, a
8 statement must -- when that contractor comes to the
9 base, his property must be put in a separate location
10 by -- specified by that project engineer.
11      Q.   Did you ask Eric Lundgren or anyone else --
12 well, first of all, did you ask Eric Lundgren why the
13 cabinets were being placed in your office area?
14      A.   Yes, I did, actually.
15      Q.   What did he say?
16      A.   He said he didn't know who put it in the
17 office.
18      Q.   Did he --
19      A.   He gave me --
20      Q.   You told me a minute ago you were friends
21 with him, right?
22      A.   Yes.
23      Q.   Did he offer to find out why they -- the
24 cabinets were moved?
25      A.   He didn't -- he didn't offer. I didn't even

## Page 20

1 ask him to offer. I mean, the offer -- he said,
2 Murphy, just to -- when he saw that Ron Howe was
3 trying to do something, do a -- perform a disciplinary
4 action against me, he gave me an e-mail, which I
5 submitted to the government, that Ron Howe or KBSI did
6 not ask me, this Eric Lundgren, whether to put cabinet
7 in my office, in our office, with a statement from
8 him.
9      Q.   Did Eric Lundgren or anyone else say
10 anything to you before you removed the cabinets?
11      A.   No. He didn't say anything.
12      Q.   When Ms. Valerie arrived, did she explain to
13 you the reasons -- the reason the filing cabinets were
14 being removed or being moved?
15      A.   I even went to Judy Ballard's office,
16 almost, like 20 feet. I went to her office. I said,
17 Judy, did you ask KBSI to put cabinets in my office?
18          Judy said, Just -- get out of my -- you
19 know, I don't want to talk to you. Go and talk to Ron
20 Howe. That's what she told me.
21          And then, later on, when I offered to
22 move -- when I was moving one cabinet, she then walked
23 all the way from my office to open the door, almost
24 bang it on my head. I said, I came to your office a
25 few minutes ago to ask you whether you asked KBSI to

Pages 17 to 20

ORAL DEPOSITION OF MURPHY A. JUNAID

### Page 21

1  put cabinet my office.  You told me to get out.  I'm
2  going to ask Ron Howe, the supervisor.  Now you came
3  over to my office, asking me why I was moving cabinet
4  out.  If she had something to say, she will -- and
5  say, Well, Murphy, I did tell them to move cabinets in
6  your office, and she doesn't have that authority.
7  She's the GS5 employee.
8      Q.  Okay.  Did Mr. Howe have the authority to
9  answer your question?
10     A.  Yes.  I went to Howe's office.  He wasn't in
11 the office.  Ron Howe wasn't in his office.  I went
12 around looking for somebody.  Nobody was in the
13 office.  Judy Ballard, who was in her office, told me
14 to get out.
15     Q.  Were there any engineering duties that you
16 could have performed while you were waiting for the
17 responsible officials to return to their offices?
18     A.  I always do my job.  I do my job, you
19 know --
20     Q.  That wasn't my question, sir.
21     A.  Sir?
22     Q.  Did you have any engineering duties that you
23 could have performed at your desk while you were
24 waiting for the responsible officials to return to
25 that area to discuss the situation?

### Page 22

1      A.  I couldn't tell you that.  I do it -- job.
2  That's all I do in my office.  You know, sometimes you
3  go to the restroom.  Nobody walks -- that was it every
4  day.  You go to restroom, you take a relief, you know,
5  you take your break.  You take a lunch.  But my job
6  is -- always get done, though.
7      Q.  Well, I'm trying to -- I'm trying to ask you
8  and find out why you didn't contact the appropriate,
9  responsible --
10     A.  I went --
11     Q.  Could you please ask -- let me finish my
12 question, sir?
13         MS. GAUL:  Let him finish his entire
14 question, and then you answer the question, okay?
15     Q.  (BY MR. WENDLANDT) When you do that, what
16 happens is, on the deposition, it has the first half
17 of my question, and then, what you're saying is the
18 answer.  And right after that is the end of my
19 question.  It makes it sound disjointed, and it would
20 help if you would answer the question, please.
21         MS. GAUL:  Listen to the exact question
22 he's asking, and just answer his question, okay?
23     Q.  (BY MR. WENDLANDT) Now, isn't it a fact that
24 you pushed Ms. Ballard out of the office and shut the
25 door in her face when she tried to talk to you?

Pages 21 to 24

### Page 23

1      A.  No.
2      Q.  In paragraph 13, the complaint, you
3  allege -- you discuss the release of personal
4  information.  Did the agency discipline you for the
5  alleged release of information?
6      A.  Yes, they did.
7      Q.  What was the -- what do you assert was the
8  discipline for that?
9      A.  It's part of a removal from my office.
10     Q.  You were removed from office for that?
11     A.  It's the same thing.  It's on that proposal.
12 The proposal sent to me was -- you know, included
13 everything.
14     Q.  Now, is it correct that on June 5th, 2009,
15 Mr. Howe recommended a 14-day suspension for creating
16 a disturbance and discourtesy related to the filing
17 cabinet incident?
18     A.  Correct.
19     Q.  Is it -- is it correct that on July 24th,
20 2009, Mr. Cook decided a 14-day suspension was not
21 appropriate, and instead issued a five-day suspension
22 for the filing cabinet incident?
23     A.  Correct.
24     Q.  Did -- do you feel like the decision to
25 suspend you for five days was motivated by your race

### Page 24

1  or national origin?
2      A.  It was -- exactly.
3      Q.  Why do you think that the decision to
4  suspend you for five days was motivated by race or
5  national origin?
6      A.  As I told you before, as an engineer, it is
7  written -- it is said by the contracting office, when
8  an engineer writes a specification to be awarded as a
9  contract, statements as a separate government property
10 from contractor's property.  The contractor put in
11 cabinets in our office without either telling those
12 two government officials in that office, Eric Lundgren
13 or myself.  No, the supervisor did not ask them to put
14 it in there, okay.  If the supervisor asked them to
15 put it in there, well, I said, Well, okay.  The
16 supervisor has the authority, but the supervisor did
17 not.
18         Three cabinets were put in our office.
19 I took one out.  For taking one out, I was -- I was --
20 you know, the proposal was discipline me
21 for disturbance.  What disturbance did I cause?  I
22 didn't talk to anybody.  I moved cabinet out, as it
23 was moved in my office.  If that's the case, whoever
24 moved the -- those cabinets in our office will have
25 caused a lot of disturbances, putting that three

## Page 25

1 cabinets in our office, but me moving one cabinet out
2 caused a disturbance.
3          What disturbance did I cause?  I didn't
4 stop anybody from working.  I moved the files out.  I
5 moved cabinet out.  I moved the files back in the
6 drawer.  And I was -- I was punished.  They said I
7 released information.  That was the information given
8 to me by the security office, by the civilian office,
9 plain and simple.  What they gave me is what I gave to
10 others.
11      Q.   Did Mr. Howe or Mr. Cook make any racially
12 derogatory comments or statements related to that --
13 the incident concerning the file cabinets?
14      A.   Didn't put it in writing, didn't talk to me.
15 They only -- all they did was just a proposal.
16      Q.   So the answer is no?
17      A.   I can't tell you that.  I cannot read their
18 mind.  I can't tell you whether the answer is no or
19 yes.
20      Q.   You have no knowledge of that?
21      A.   I do -- I don't have knowledge of it.
22 That's --
23      Q.   You don't know whether they did or didn't?
24      A.   Exactly.
25      Q.   Now, what was the prior protected activity

## Page 26

1 that you assert motivated the decision to end the
2 suspension?  In other words, you're saying -- you're
3 asserting retaliation in your complaint.
4      A.   Prior to that incident, I have already gone
5 to the inspector general office and complained about
6 Christian Cook that -- writing almost $500,000 of my
7 design project for -- to KBSI's use.  I wrote a
8 specification -- I prepare economic analysis for the
9 project to be done.
10          When congress appropriated funds, they
11 always appropriate 10 percent of that project for
12 design.  The design money that was supposed to be for
13 my project, almost $500,000 was diverted by Christian
14 Cook for use to KBSI's project.  And I -- I produced
15 documentation, Christian Cook's signatures with
16 statement stating divert this money for another use,
17 and I sent it to the inspector general office.  And
18 Christian Cook did not like that.
19      Q.   Okay.  So is it correct that you're
20 asserting that Mr. Cook's response to your complaint
21 about the moving of the cabinets was -- is what you're
22 objecting to, right?  Let me back up just a minute.
23      A.   Rephrase your question, please.
24      Q.   You're saying that because you filed a
25 complaint with the inspector general concerning

## Page 27

1 Mr. Cook, that you're being retaliated against because
2 of that?
3      A.   Correct.
4      Q.   Any other reason?
5      A.   Well, that's the beginning.
6      Q.   What did you say, sir?
7      A.   That's the beginning of retaliation, because
8 soon after that -- I mean, if you ask any question,
9 I'll answer that later on.
10      Q.   Well, was there other activity that -- in
11 connection with the moving of the cabinets that was --
12 that caused your five-day suspension?
13      A.   Well, soon after that, when I came back from
14 suspension, okay, then the -- within two or three
15 weeks again, the -- another incident happened.  And
16 they -- well, they suspend me finally for another 14
17 days -- or 30 days, and they cut it down to 14 days.
18      Q.   Okay.  I believe the next matter was the --
19 your nonselection for a supervisory industrial
20 engineer position; is that correct?
21      A.   Correct.
22      Q.   Is this -- that position referred to as the
23 IED chef -- chief?
24      A.   Chief, yes, correct.
25      Q.   And I understand you learned Gary Hogg was

## Page 28

1 selected for the supervisory vacancy on the 1st of
2 July, 2009?
3      A.   Correct.
4      Q.   Now, as I'm understanding some of the
5 documents I've been looking at, the reason that you
6 feel you were more qualified than Mr. Hogg for the
7 supervisory position was because, at the time of the
8 selection, he was a contract employee, while you were
9 already a federal government employee; is that
10 correct?
11      A.   Correct.
12      Q.   What, if anything, causes you to think that
13 your nonselection was motivated by race or national
14 origin?
15      A.   Well, as an industrial engineer, and
16 according to our program, according to the office of
17 personnel (inaudible), job description, we have three
18 basic, fundamental things that we're supposed to do --
19 prepare economic analysis, write specification,
20 procure and install the system.  I have bachelor's
21 degree in industrial engineering.  I have master's
22 degree in economics, and I've been
23 reading specification -- I mean, preparing economic
24 analysis for the government, starting from Red River
25 Army Depot, all the way to Corpus Christi Army Depot

Pages 25 to 28

ORAL DEPOSITION OF MURPHY A. JUNAID

## Page 29

1  for 15 years.
2       I have the basic, fundamental
3  qualifications, and I've worked for the government for
4  almost 13 years. Why would a director pick a
5  contractor with not a single minute working for the
6  federal government to select that contractor as a
7  supervisor position for engineers -- I'm not the only
8  one over there with 10 -- 10 years' experience -- that
9  even more with 25 years of government experience doing
10  the same job. ·Christian Cook picked Gary Hogg, with
11  no one damn minute in the government service, not even
12  in the active military service to call him a veteran,
13  to be a supervisor for the same office. That's a
14  worked in contract, unlawful contract to his contract,
15  to his employer, KBSI. That's -- is uncalled for.
16  That's purely discrimination.
17       Q.   Is the discrimination because you had been a
18  federal employee, and he had not been a federal
19  employee?
20       A.   That's one -- yes, that's one of them.
21       Q.   Now, regarding the 14-day suspension that
22  you mentioned ago -- a minute ago, you were scheduled
23  to act as the facilitator for the team meeting on
24  August 6th, 2009; is that correct?
25       A.   Correct.

## Page 30

1       Q.   Was the facilitator responsibility assigned
2  based on a roster created by the IED chief?
3       A.   Correct.
4       Q.   Was Mr. Howe the acting IED chief until Hogg
5  reported for duty as the new chief?
6       A.   Correct.
7       Q.   Did you consider Mr. Howe a threat when he
8  was at the meeting?
9       A.   Mr. Howe is not an employee of IE division.
10  No other employees is authorized to attend any meeting
11  that is not a member of. Mr. Howe used to be a
12  temporary division chief when the position was
13  announced. His position ended on July -- end of July.
14  Gary Hogg was supposed to take office on August the
15  3rd.
16       When Gary Hogg was -- during that time,
17  Gary Hogg was in the meeting. Gary Hogg was in the
18  meeting. I was on the roster. Actually, Tom Green
19  was on the roster to act as division chief. Tom Green
20  was absent. My name was next on the list. I was
21  supposed to act as division chief and had every
22  authority -- I had the authority in that position to
23  act in that position.
24       When the meeting started, Ron Howe came
25  to our meeting without invited, without announcement

## Page 31

1  from anybody that he's supposed to be in a meeting.
2  Nobody goes to any of the meeting without being
3  invited or without being previously announced that he
4  or she would be attending the meeting. When Ron Howe
5  showed up, he sat on the very table, on the chair that
6  he used to sit. What he's done as a spy. That's
7  supposed to be division chief sit.
8       When I came to the meeting, I asked him
9  to excuse himself from my seat because, as acting
10  division chief, I was supposed to sit in that seat.
11  He moved. When he moved, then I asked him, as the
12  acting division chief, Mr. Howe, Who invited you to
13  our meeting? He didn't say. I asked again. He
14  didn't say. I asked again. I said, Well, please
15  excuse yourself from our meeting. He did not. What
16  did I do? I went out and called the security to, you
17  know, escort him, to at least assist in asking him to
18  leave.
19       Q.   So did you -- let me ask you, do you
20  consider that reasonable conduct?
21       A.   Reasonable conduct?
22       Q.   Yes.
23       A.   Very well, because I was the acting chief,
24  and I have the authority in that position to act.
25       Q.   And what do you base this on that you're

## Page 32

1  saying that you have the authority of acting chief?
2  Isn't it correct the proper terminology is you were
3  the facilitator of the meeting?
4       A.   No, not -- the facilitator is just a
5  point -- there are three things when you go in the
6  meeting that we do. You facilitate. You type -- you
7  work on the computer. One's on the computer. The
8  other person just listen -- to read the -- the agenda.
9  As the division chief -- acting division, the roster
10  says in the absence of the supervisor, the next -- the
11  person on that roster acts as the division chief.
12  That's what the roster says.
13       Q.   Do you have that in writing anywhere?
14       A.   It is in writing.
15       Q.   Where?
16       A.   When we go to court, I'll show you that.
17  I'll show you. It's in the papers submitted to -- you
18  have -- do you go to court -- do you ask them, Did we
19  give you those rosters? Did we give you that roster?
20  It's written by Cary Jackson, the former division
21  chief. And it's written, continued by Ron Howe, the
22  temporary division chief. It is written.
23       Q.   Do you know how long Mr. Howe's been an
24  engineer?
25       A.   Used to work at Kelly Air Force Base before

Pages 29 to 32

## Page 33

1  he was -- Kelly was closed. Then he went home. Then
2  Corpus Christi Army Depot -- excuse me, he applied for
3  a job at Corpus Christi Army Depot. Then he was
4  employed.
5      Q.  I'm asking, do you know how many years he
6  has been an engineer?
7      A.  I don't know.
8      Q.  So is it correct that on -- in September of
9  2009, Mr. Hogg recommended a 30-day suspension for
10  creating a disturbance and insubordination for the
11  incident at the team meeting; is that correct?
12      A.  Not Mr. Howe. It's Gary Hogg.
13      Q.  Mr. Hogg recommended that?
14      A.  Yes. Okay. Yes.
15      Q.  And is it true that in December Mr. Cook
16  reduced -- September 2009 Mr. Cook reduced the
17  recommendation and issued a 14-day suspension?
18      A.  Yes, he did.
19      Q.  Is it -- why do you think that the decision
20  to suspend you 14 days was motivated by race or
21  national origin?
22      A.  When that proposal was sent to me, I went to
23  the union. The union asked Christian Cook to give us
24  time to respond to the proposal. He refused. When
25  they refused it, union said you have violated the

## Page 34

1  union agreement with the federal government with the
2  Corpus Christi Army Depot. He said he would not give
3  us time to -- give me time to respond. So I did not
4  respond to his proposal. So he just came out with a
5  division for 14 days' suspension.
6      Q.  Are you asserting that the decision to
7  suspend you 14 days was retaliation for -- for your
8  complaint to the office of special counsel?
9      A.  Correct.
10      Q.  Any other reasons?
11      A.  It's discrimination against me because he
12  did not allow me to respond to his proposal. He did
13  not -- I did not respond to his proposal because he
14  didn't give us time to do that.
15      Q.  Were you told prior to October of 2010 that
16  the action register responsibility during home team
17  meetings was mandatory?
18      A.  No.
19      Q.  Are you saying that you were not told in May
20  of 2010 that the supervisor has the authority to make
21  the action register mandatory?
22      A.  There's never -- Gary Hogg was selected on
23  August 3rd. He has no knowledge of how the federal
24  government works. Kelly Jackson, a prior supervisor,
25  when he makes roster, he never said anything is

## Page 35

1  mandatory. If someone is absent during the meeting,
2  the next person on that roster acts for -- in that
3  position. There's nothing mandatory to come to the
4  meeting.
5      If you have -- if an engineer has a
6  project working on downstairs, it's preferable for
7  that engineer to go downstairs and work on his
8  project, rather than come to the meeting. Kelly
9  Jackson knows that. He was the -- he was the chief
10  during that period. There's nothing mandatory in
11  attending a meeting. A meeting is done at breaktime,
12  8:00 o'clock, the breaktime for employees.
13      Q.  Did you attend any of the IED home team
14  meetings during the month of October 2010?
15      A.  I do. I probably did.
16      Q.  Did your supervisory chain of command excuse
17  you from the action register duties from the month of
18  October 2010?
19      A.  I asked him to remove me from the list
20  because of a prior incident that I complained about,
21  about Ron Howe coming to a meeting. I acted on his
22  behalf, and then he punished me -- disciplined me for
23  five days. Then he put me back on the register again.
24  He asked for volunteers, okay. If you would like to
25  be a member of the volunteers to act on my behalf,

## Page 36

1  submit your name. And I said, I'm not interested. Do
2  not put my name on there. But he went ahead anyway
3  and put my name on there. And I said, Listen because
4  of my prior experience -- which, you disciplined me
5  for acting on your behalf. I do not want to
6  participate. It's very simple.
7      Q.  So in other words, you were not excused from
8  the meeting?
9      A.  I told -- whether he excused me or not, but
10  I said, Do not list my name on the roster.
11      Q.  Okay. So you told your supervisor how to
12  manage?
13      A.  No. I did not tell him how. He asked for
14  volunteers, volunteers. It's a e-mail to everybody,
15  if you want your name to be listed, volunteer. And I
16  said, No, I do not want my name to be listed.
17      Q.  Well, as the facilitator, you still had
18  action register duties, did you not?
19      A.  I'm not a facilitator. His statement says,
20  If you want your name to be listed, volunteer. And I
21  said, I do not want my name to be listed on the
22  roster, very simple.
23      Q.  Did you send two e-mails to Mr. Hogg on
24  October 7 stating, in quotes, I do not know -- have
25  any idea of who -- well, let me back up just a second.

Pages 33 to 36

ORAL DEPOSITION OF MURPHY A. JUNAID

Page 37

1  Let me withdraw that.
2              (Exhibit Nos. 1 and 2 were marked for
3              identification.)
4      Q.    (BY MR. WENDLANDT) I'm going to show you a
5  one-page document that's labeled, Defendant's Exhibit
6  No. 1, and ask if you recognize that.  Do you
7  recognize that?
8      A.    Yeah.
9      Q.    Did you type the two paragraphs above your
10 name?
11     A.    Yes, I did.
12     Q.    And this e-mail was a response to an e-mail
13 from your supervisor; is that correct?
14     A.    Correct.
15     Q.    I'm going to show you what's been marked as
16 Defendant's Exhibit No. 2 and ask if you recognize
17 these two e-mails.
18     A.    Yes, I recognize them.  Yes.
19     Q.    And the two paragraphs beneath the name
20 Mr. Hogg and above Murphy Junaid, those -- that's your
21 typing, correct?
22     A.    This one right here, yes.  The one on top,
23 correct.
24     Q.    Correct?  Is that correct?
25     A.    Correct.  I said correct.

Page 38

1      Q.    Is this typical of the way that you address
2  supervisors in your workplace?
3      A.    When a supervisor comes to my office to
4  harass me more than two or three occasions and I've
5  reported him again and again.  Nothing happens.  When
6  it gets frustrate.  So I wrote -- you know, I wrote a
7  e-mail, because he -- I said if he doesn't stop coming
8  in my office to harass me -- my office is different
9  from his office.  If he doesn't stop coming in to
10 harass me to -- not just about my work -- because I do
11 my work pretty well -- on something else, then it's
12 leading to -- to a disaster.  He wants me to -- he
13 wants to provoke me either attack him or cause a
14 fight.  But I'm better intelligent than that.  So I
15 put it in e-mail, stop harassing me.
16     Q.    Well, he was asking -- I mean, he was
17 informing you that -- in his e-mail that the October
18 7th industrial engineering chief's office meeting was
19 mandatory, that you could bring a union representative
20 with you.
21     A.    It's not -- it's not a IED meeting.  He
22 wants me to come to his office.  I said there's
23 nothing for me to come to your office for, because he
24 was relating to something happened previously.  I said
25 I have no idea what you're talking about.

Page 39

1      Q.    Okay.  So you disobeyed your supervisor --
2      A.    I did not disobey him.
3      Q.    Can you let me finish the sentence, please?
4              MS. GAUL:  Please let him finish.
5      Q.    (BY MR. WENDLANDT) So your supervisor told
6  you it was a mandatory meeting, and that you could
7  bring your union representative with you?
8      A.    Correct.
9      Q.    And you refused to come, correct?
10     A.    Most likely.
11     Q.    You called him a -- as I'm -- your sight and
12 size intimidate me.  Your sight is hateful.  You are a
13 bigot, a racist, prejudiced, and have discriminated
14 against me.  Then you say, If you do not stop
15 harassing me or the CCAD management does not separate
16 you or I from the industrial engineering division
17 office, your actions against me will surely lead to a
18 disaster.  What did you mean by disaster?
19     A.    As I said before, when he comes to my
20 office, his intention is to provoke me, as a black
21 man, for either react and either hit him or attack him.
22 As an engineer, I refuse to do that.  So I put it in
23 an e-mail, You need to stop harassing me, and I copied
24 official -- senior official to make sure what is going
25 on in my office.

Page 40

1              If I just send it to him, he might just
2  delete it.  I copied senior officers.  This supervisor
3  is harassing me.  He's coming to my office to provoke
4  me, to attack him to my removal -- that might lead to
5  my removal.  And assured will not do that.  And
6  then -- and I asked for separation between him and
7  myself.
8      Q.    Is it correct that Mr. Hogg recommended your
9  removal from federal service for insubordination,
10 discourtesy towards a supervisor, and false
11 statements --
12     A.    He did.
13     Q.    -- in November -- in November of 2010?
14     A.    He did.
15     Q.    Is it correct that on March 14th, 2011,
16 Mr. Bratty issued the decision to terminate you?  Is
17 that correct?
18     A.    Correct.
19     Q.    Do you have any factual basis for asserting
20 that Mr. Bratty's decision to terminate you was
21 motivated by your race or national origin?
22     A.    Must be because on my proposal -- on my
23 response to his proposal, I submitted documentations,
24 more than 23, supporting evidence relating to the
25 beginning to end of reporting Mr. Cook to the

Pages 37 to 40

ORAL DEPOSITION OF MURPHY A. JUNAID

## Page 41

1  inspector general office, of reporting Ron Howe to the
2  inspector general office, of reporting Gary Hogg to
3  the inspector general office for fraud, corruption,
4  mismanagement, misrepresentation, unlawful contracts
5  for his friend's record.
6      Q.   Okay.  You've answered with a number of
7  reasons, but you didn't answer my question.  I was
8  asking about why you felt like it was motivated by
9  your race or national origin.
10     A.   Because he did not pay attention to what I
11 gave to him, supporting evidences.  He neglected every
12 single supporting evidence that I gave for him and
13 said -- just said, Well, I just suspend -- I'll just,
14 you know, remove him from office.  That's my way of
15 seeing it.
16     Q.   So you're saying that -- did you make some
17 sort of a proposal or recommendation that was not --
18 that was not accepted or acted upon?
19     A.   Well, I asked him to separate me from
20 industrial engineering because I can be moved to any
21 other office I want.  He didn't pay any attention, and
22 he ignored every supporting evidence that I submitted.
23     Q.   What was the prior protected activity that
24 you assert you participated in that you think
25 motivated Mr. Bratty's decision to terminate your

## Page 42

1  employment?
2      A.   You keep asking me about the laws -- okay.
3  I just told you, I'm not a law student, and I do not
4  read every single law provided by the federal
5  government.  All I know is the job that I do, prepare
6  economic analysis, write specification, procure, and
7  maintain.  Those law within the contract that the work
8  that I do is what I based on.  If you ask me about
9  what protect -- what law protects me from
10 discrimination, from retaliation, I cannot tell you
11 that.  You have to go to the federal government office
12 and look out -- read the laws.  I'm not a law student.
13     Q.   My question is, what did you do -- what type
14 of activity -- did you say something or do something
15 that you think that that was -- that you assert
16 caused -- let me withdraw that question.
17         With respect to Mr. Bratty's decision
18 to terminate your employment, are you saying that that
19 was because of your inspector general's complaint?
20     A.   It might be, because when asked so many
21 documentation during -- to respond to his proposal to
22 remove me from my office, not all the evidence is that
23 I submitted to the inspector general from diversion to
24 unlawful contract, to -- all the supporting -- he did
25 not take single moment to look at it.  He said I was

## Page 43

1  lying.  He believed Gary Hogg against myself and even
2  three or four (inaudible) workers who said I was in
3  their office when Gary Hogg said he was in my office.
4  He believe all -- he did not believe all five
5  employees, but he believed exactly what Gary Hogg
6  said, against five employees who coordinated that I
7  was in their shop during that meeting that Gary Hogg
8  said he had in my -- in his office.  Not everything
9  that we said.  He said, I believe Gary Hogg -- because
10 I'm the only black person in the -- Gary Hogg was
11 white ron Howe was white.  Christian Cook was white.
12             MR. WENDLANDT:  Pass the witness.
13               E X A M I N A T I O N
14 BY MS. GAUL:
15     Q.   Mr. Junaid, after you weren't promoted to
16 the position and Gary Hogg got the position, what did
17 you do to complain about that?
18     A.   I filed a EEO complaint.
19     Q.   Do you think any action was taken against
20 you as a result of you filing that first EEO
21 complaint?
22     A.   No, no serious action was taken.  It just
23 went through the paperwork, and they rejected.
24     Q.   Do you think there was any retaliation
25 against you as a result of you filing EEO complaints?

## Page 44

1      A.   Correct.
2      Q.   What do you think was the retaliation
3  against you for filing an EEO complaint?
4      A.   Once I file a EEO complaint, Christian Cook
5  managed to talk to Gary -- put Ron Howe in a position
6  where Ron Howe would say, Well, remove him from
7  office.  They collaborate it to find something --
8  little things I did.  When I moved cabinet out of the
9  office -- which is, normally, under the law, supposed
10 to be separated -- when I took Ron Howe to move --
11 excuse himself from the office, when he's supposed to
12 be under me, I have that authority to do so.  He said,
13 Well, even Ron Howe told one of the employees that,
14 That Murphy, we shall remove him from office.
15     Q.   That's the only question I have.  Thank you.
16             MR. WENDLANDT:  Pass the witness.
17             MS. GAUL:  That's it.
18             (The deposition concluded at
19             11:07 a.m.)
20
21
22
23
24
25

Pages 41 to 44