BEFORE THE

MERIT SYSTEMS PROTECTION BOARD

In the Matter of:                    )
                                     )
MURPHY A. JUNAID,                    )
                                     )
                Appellant,           )  Docket No.
v.                                   )  DA-0752-11-0398-I-1
                                     )
DEPARTMENT OF THE ARMY,              )
                                     )
                Agency.              )
                                     )

                        5th Floor Courtroom
                        Nueces County Courthouse
                        901 Leopard Street
                        Corpus Christi, Texas

                        Thursday,
                        September 8, 2011

                The above-entitled matter came on for hearing,
pursuant to notice, at 9:05 a.m.

            BEFORE:  HON. RONALD J. WEISS
                     Administrative Law Judge

            APPEARANCES:

            On behalf of the Appellant:

            MALINDA A. GAUL, ESQ.
            Gaul and Dumont
            924 Camaron
            San Antonio, Texas  78212
            (210) 225-0685

            On behalf of the Agency:

            KEN MUIR, ESQ.
            Office of Legal Counsel
            Corpus Christi Army Depot
            AMCC-LG
            308 Crecy Street, MS 15
            Corpus Christi, Texas  78419
            (361) 961-3432

                    ON THE RECORD REPORTING
                        (512) 450-0342

EXHIBIT E

6

1  Corpus Christi Army Depot.

2      Q      And before that, what position did you have?

3      A      I was chief of Industrial Engineering Division,

4  Corpus Christi Army Depot.

5      Q      Okay.  Before you started working at CCAD in

6  2009, what position did you hold?

7      A      I was the senior project manager, program

8  manager, for Corpus Christi Army Depot with Knowledge-

9  Based Systems.  It's a private consulting firm.

10      Q      How long did you work for Knowledge-Based

11  Systems?

12      A      A little over ten years.

13      Q      On March 26, 2009, while you were still working

14  for Knowledge-Based Systems, there was an incident where

15  there was a discussion and a home team meeting about

16  overcrowding in the Knowledge-Based Systems area, and then

17  an incident involving some file cabinets.  Can you please

18  describe your participation in that incident?

19      A      We had an issue where we had a couple of new

20  employees that were coming in for Knowledge-Based Systems

21  that required a couple of additional desks in the area

22  that we occupied in Building 8 of CCAD.  Part of what

23  would be required would be to pull some file cabinets that

24  were occupying space where we're going to put desk

25  locations into an adjacent office, to add those two desk

7

1   locations.

2       We had gone to Ron Howe at this home team
3   meeting, requesting to utilize that space and to relocate
4   the file cabinets, and he had approved it.  We went
5   through restructuring the office space, pulling the file
6   cabinets into another adjacent office, and establishing
7   the two desks.  And I'm sorry.  I --

8       Q    And so what happened, as far as you were
9   involved?  What did you see or what happened?

10      A    I was -- I actually am in an adjoining office
11  to the space that was being rearranged, so my desk
12  actually looks upon the area that was being reconfigured.
13  Sometime later that morning, after the space had been
14  rearranged, I was confronted by Murphy Junaid who came up
15  to my desk and was complaining that the space had been
16  rearranged without being coordinated through him, and I
17  directed him to go speak to Mr. Howe, who was the acting
18  division chief for industrial engineering at the time.

19      Q    Was that all that you were able to observe?

20      A    No.  Actually there was quite a bit more.
21  After that confrontation, he came back to the office space
22  approximately an hour, 45 minutes later, and began pulling
23  files out of file cabinets that were placed into an office
24  space that he occupies at the time with another coworker,
25  Eric Lundgren.  He pulled files out of the file cabinets

8

1   and then started to pull the file cabinets out of that

2   space, into the office space that KBSI was occupying.

3         During that time, Mr. Judi Ballard who was the

4   admin assistant for industrial engineering came into the

5   room and was basically instructing him to stop, you know,

6   disrupting the office space, and at that point, he pushed

7   with his forearm, pushed her back towards the doorway that

8   entered that office space, and then eventually closed the

9   door into her, as she was speaking to him and telling him

10  to stop the misbehavior at the time.  I witnessed that,

11  and then after that, Mr. Junaid left the space.

12        Q    As far as you know, was there anything that you

13  did wrong for which management should have taken some kind

14  of corrective action?

15        A    No.  I don't think I did anything improper.

16        Q    Sometime after that, you applied for and were

17  selected for the position of chief the Industrial

18  Engineering Division.  Is that right?

19        A    That's correct.

20        Q    Who selected you for that position?

21        A    Kresten Cook who was the director of

22  engineering services at the time.

23        Q    Did you become aware at some point that that

24  selection he made was challenged in an EEO case later

25  brought by the Appellant?

10

1    Q    Okay. Did you become aware that the 14-day
2    suspension that the Appellant eventually received from
3    that incident from Mr. Cook was challenged at another EEO
4    case brought by the Appellant?
5    A    I was aware that that had happened.
6    Q    Now, at the time that you became the IED chief,
7    was it customary for your work center to have what's
8    called a home team meeting from time to time?
9    A    It's not from time to time. It's actually
10   regularly scheduled. It was every Wednesday at 8:00 a.m.
11   It is a mandatory meeting for all the industrial
12   engineering staff.
13   Q    And were these meetings part of a CCAD-wide
14   initiative under something called Process-Based
15   Leadership, PBL?
16   A    Yes, it is.
17   Q    And what word did your work center -- did the
18   folks usually use to call these meetings?
19   A    The home team meetings.
20   Q    Home team meetings? Basically what went on in
21   these home team meetings?
22   A    Basically, it's meant to be a forum, so that
23   the engineers and other staff can bring issues to the
24   industrial engineering chief that requires his attention
25   and action for status, as well as coordination amongst our

11

1   team and other organizations at the depot.  So it's

2   primarily a staff meeting to talk about open actions.

3        Q     What were the roles that had to be fulfilled by

4   individuals at these meetings?

5        A     There were three defined roles.  There was a

6   facilitator who acted as the meeting leader and directed

7   the agenda of the meeting.  You had an action register

8   keeper who basically was your recorder for new actions and

9   updates to the software system, which was actually called

10  PBL, Process-Based Leadership, to input those actions and

11  maintain record of the meeting during the event.  And then

12  we also had hazard analysis or safety tip as a required

13  role.  So there were those three defined roles for those

14  meetings.

15       Q     Was the action register role a difficult task

16  for someone to perform?

17       A     No, no.

18       Q     Was it oppressive in any way?

19       A     No.

20       Q     Was attendance at these meetings mandatory in

21  your work center?

22       A     Yes, they were.

23       Q     Was there any way to get out of these --

24  attending the meetings?

25       A     Absolutely.  I mean, if there was an urgent

ON THE RECORD REPORTING
(512) 450-0342

12

1    requirement, if somebody was on scheduled leave prior to

2    the meeting, they would be excused.  If it was an urgent

3    matter, it needed to be coordinated with me in terms of

4    noting that they would not be in attendance.  But

5    otherwise it was considered mandatory.

6            MR. MUIR:  Permission to approach the witness,

7    Your Honor.

8            JUDGE WEISS:  Yes.

9            BY MR. MUIR:

10       Q    I'm showing you what's been marked as Exhibit

11   4-T, and from the Agency response, and Exhibit 4-T is an

12   email exchange from May 12 and 13 of 2010.  And it starts

13   with Mr. Weeks telling you that the Appellant did not want

14   to be on a list to give a safety tip for September,

15   because he didn't volunteer.

16       A    Yes.

17       Q    Now, who is Mr. Weeks?

18       A    Mr. Weeks was a representative of the AFGE

19   union, the local union for professionals and Wage Grade

20   workers at CCAD.

21       Q    Had you been having -- before this email, had

22   you been having any discussion with the Appellant about

23   his performing PBL roles at the home team meeting?

24       A    He had voiced an issue that he didn't want to

25   have any assigned role during the meeting.  Part of the

ON THE RECORD REPORTING
(512) 450-0342

13

1    issue came about because of the incident that had occurred

2    with Mr. Howe regarding the prior PBL, and I had allowed

3    him to not act as a facilitator, but the role of action

4    register keeper and the hazard analysis roles, he was

5    required to maintain.  And that was part of the reason for

6    this exchange, was to reinforce that those roles were

7    appropriate and that he had them as normal parts of his

8    duty.

9        Q    So you'd already let him know in some way that

10   he didn't have to be facilitator at these meetings.

11       A    That's correct.

12       Q    Okay.  And in the email, Mr. Weeks tells the

13   Appellant that you are correct, that you can assign safety

14   tips to the Appellant because you're expecting it from all

15   the IED staff.

16       A    That's correct.

17       Q    And is it true that you were expecting all of

18   your staff to participate with the safety tips and action

19   register?

20       A    Absolutely.

21       Q    Did you have any more discussions with the

22   Appellant about this matter between that email in May --

23   which was sent in May and October of 2010?

24       A    Yes.  It came about again at the beginning of

25   the fiscal year, which occurs October 1.  I re-released

17

1    started, you know, this year's list, he had just completed

2    those roles and didn't appear on the next one.  We had a

3    approximately 16 people in our department, and were

4    rotating through a 12-month cycle, so he would have

5    appeared on the FY-12 rolls if the roster had maintained

6    the same.

7         Q    Take a look at tab 4-R, please, R as in Robert.

8         A    (Complying.)

9         Q    And you should be looking at an email from the

10   Appellant in which he says, also on October 4, that he is

11   absolutely not interested in participating.

12        A    Yes.

13        Q    Besides you, who are those other folks that he

14   copied on that email?

15        A    It went out to all the staff of industrial

16   engineering, and I believe that's the limit of this email.

17        Q    Now, had he tried to call you, to discuss that

18   matter before sending out that email response?

19        A    No.

20        Q    Did you communicate back with him in some way

21   after you got that email about that?

22        A    Yes, I did.

23        Q    How did you -- what did you do?

24        A    I believe I communicated to him verbally and an

25   email that again the roles are not, you know, voluntary

18

1  for the action register, that they're assigned duties and

2  that I expected him to perform them.

3      Q      On October 6, which was a employed, there was a

4  home team meeting.  Is that right?

5      A      That's correct.

6      Q      And what room was the home team meeting held

7  in?

8      A      It was being held in the -- what's called the

9  DES conference room, Directorate of Engineering Services

10  conference room, which is adjacent to the industrial

11  engineering space in Mez 33, Building 8.

12      Q      And what time was the meeting set for?

13      A      it was set for 8:00 a.m. on Wednesday.

14      Q      When you got to the room, who else do you

15  recall being there?

16      A      At the time -- I keep a roster of the IED

17  staff, so I would have done a check-off, but Mr. Junaid

18  was not present.  I don't recall anyone else who was

19  absent during the meeting.

20      Q      But actually I'm not asking you during the

21  meeting.  I'm asking when you initially just walked in the

22  room, do you recall who else was in the room?

23      A      Predominantly all of the IED staff.

24      Q      Okay.

25      A      We also have contractors who attend the

ON THE RECORD REPORTING
(512) 450-0342

19

1    meetings, so there probably was a representative of

2    contract groups there, too.

3        Q    When you got to the room for the meeting, was

4    the system logged on to the meeting agenda?

5        A    No, it wasn't.

6        Q    And that's what the action register person

7    would have done.  Right?

8        A    That's correct.

9        Q    What did you do when you noticed that Mr.

10   Junaid was not there?

11       A    First of all, I sat at the table for a couple

12   of minutes, prior to the starting of the meeting time.

13   When it was obvious that, you know, he wasn't going to be

14   there in time to get set up for the meeting, I went to Mr.

15   Junaid's desk.

16       Q    You went to go look for him?

17       A    Yes, I did.

18       Q    Did you find him?

19       A    Yes, I did.

20       Q    And more or less, what time was it that you

21   left that conference room?

22       A    It was nearly straight up eight o'clock.  It

23   may have been, you know, half a minute before or half a

24   minute after, but it was roughly straight up eight

25   o'clock.

ON THE RECORD REPORTING
(512) 450-0342

20

1      Q     And had the meeting actually started yet when

2   you went to go look for him?

3      A    No.  I asked somebody to be prepared to step

4   in, to bring up the action register, to start the meeting

5   when I returned, but I didn't anticipate being gone more

6   than a meeting or two, and then we would start the

7   meeting.

8      Q    Was there anyone who knew that you were leaving

9   the meeting to go look for the Appellant?

10     A    I communicated to Judi Ballard, you know,

11   before I left the room that I was going to go try to

12   locate Murphy to have him come in and set up to run the

13   meeting.

14     Q    Roughly how long does it take to walk from the

15   DES conference room to what at that time was the

16   Appellant's office?

17     A    I walked it.  It takes less than 45 seconds

18   from the conference room to his desk.

19     Q    So you walked it and you timed it?

20     A    Yes.  It's about 120 feet, and it took about

21   42, 43 seconds.

22     Q    Okay.  Can you please turn to Exhibit 15, which

23   is in the back of that binder.  It's actually probably the

24   very last exhibit there.  It's a blueprint.

25     A    (Complying.)  Yes.

21

1    Q    Okay.  Looking at that blueprint, is that an

2    accurate portrayal of the relative locations of the DES

3    conference room and the Appellant's office?

4    A    Yes, it is.

5    Q    Okay.  You can close that binder up, please.

6    And when you got to the Appellant's office, was he there?

7    A    Yes, he was.

8    Q    And what happened?

9    A    I told him that, you know, the PBL meeting was

10    about to start, the home team meeting was about to start.

11    He had an assigned role as the action register keeper and

12    that he needed to present himself at the meeting and to

13    begin the meeting and log on, get us prepared to start our

14    home team meeting.

15    Q    And what did he tell you?

16    A    he just basically told me to get out of his

17    office, that he -- he told me he had no interest in

18    participating.  Again I reinforced that he had an assigned

19    role, that it was a mandatory role, and that he present

20    himself, you know, for the meeting.  Again he directed me

21    to get out of his office, and at that point, I left the

22    office space, and I went back to conduct the meeting.

23    Q    What tone of voice did he use to tell you to

24    get out of his office?

25    A    Hostile, raised voice, shout.

22

1    Q       How long do you think that verbal exchange

2  between the two of you took?

3    A       It was less than a minute, minute and a half at

4  most.  I didn't time it, but it was less than two minutes

5  for sure.

6    Q       And when you got back to your home team

7  meeting, did you tell anyone what had transpired?

8    A       No.  I sat down.  I instructed the meeting to

9  start.  I had a substitute step over, log into the

10 computer, and start the home team meeting.  And then I

11 immediately sat down and recorded notes from the incident

12 that had occurred.

13   Q       Take a look at tab 4-Q.

14   A       (Complying.)  Yes.

15   Q       And that's a memorandum dated October 6 of

16 2010.  Is that right?

17   A       That's correct.

18   Q       When did you type that up?

19   A       I typed it up immediately after the home team

20 meeting.  The home team meeting typically lasts between 45

21 and 50 minutes, and I went back immediately to my desk

22 after that meeting and wrote the memo.

23   Q       Is the memorandum accurate?

24   A       Yes, it is.

25   Q       In that memorandum at paragraph 11, it says

23

1 that you made notations of the Appellant's comments

2 immediately after the encounter.

3    A  Yes.

4    Q  Where did you make those notations?

5    A  I have a calendar book that has in it a roster

6 for the home team meeting and a space for note-taking, and

7 I just -- I had wrote my notes immediately, you know, when

8 I got back to the home team meeting and after it had

9 started.  It was on just my calendar book at that time.

10    Q  In the same paragraph 11, you say that you're

11 recording this memorandum at 9:10 a.m., immediately after

12 the --

13    A  Yes.

14    Q  -- PBL meeting.  Did you save that memorandum

15 on your computer?

16    A  Yes, I did.

17    Q  Did you send the memorandum to me?

18    A  I believe so.  I don't remember the date that

19 it was sent to you.

20    Q  Take a look at Exhibit 5, again towards the

21 back of the binder.

22    A  (Complying.)

23    Q  Are those the Outlook properties from the

24 document which is called M Junaid 10-06-10 --

25    A  Yes.

24

1    Q      -- .doc?  Okay.  And that shows -- it says that

2    you created that document at 9:10 a.m. on October 6, 2010.

3    A      That's correct.

4    Q      Is that information accurate?

5    A      Yes, it is.

6    Q      Now, the Appellant says that you made all this

7    up and that there was never any meeting with you on

8    October 6.  How do you respond to that?

9    A      Well, that's false.  There was a confrontation

10   that happened at that point.

11   Q      Did you follow up with the Appellant about the

12   incident?

13   A      Yes, I did.

14   Q      What did you do?

15   A      Called for a meeting to occur on the 7th to

16   discuss the incident and again his nonparticipation in the

17   home team meeting.

18   Q      Please take a look at Exhibit 4-P, P as in

19   Peter.

20   A      (Complying.)

21   Q      On the bottom half of that page, there's an

22   email that you sent the Appellant on October 6, directing

23   him to accept your calendar invite for an October 7 two

24   o'clock meeting.  Is that right?

25   A      That's correct.

ON THE RECORD REPORTING
(512) 450-0342

32

1    entered on October 7, that it was false because he was

2    actually seated at his desk when you entered his office.

3    Correct?

4        A        That's correct.

5        Q        Okay.  And is everything in that memorandum

6    true and correct?

7        A        Yes, it is.

8        Q        When did you write that memorandum?

9        A        I wrote it immediately after we had the

10   discussion at two o'clock, the scheduled 1400 meeting.  It

11   was done within an hour of that meeting.

12       Q        In the October 7, two o'clock meeting, did you

13   again make it clear to the Appellant that participation in

14   the home team meetings was mandatory?

15       A        Yes, I did.

16       Q        The next home team meeting was actually held on

17   Wednesday, October 20, 2010.  Is that right?

18       A        That's correct.

19       Q        Did the Appellant attend that October 20

20   meeting?

21       A        No, he did not.

22       Q        Had the Appellant arranged for anyone else to

23   do the action register at that meeting?

24       A        No, he did not.

25       Q        Take a look at Exhibit 4-L.

33

1    A    (Complying.)  Yes.

2    Q    Is that the memorandum you prepared regarding

3 the October 20 meeting?

4    A    Yes, I did.

5    Q    Okay.  And that's regarding -- well, let me ask

6 you.  Did you have a meeting on October 25 with the

7 Appellant to discuss his failure to attend the October 20

8 meeting?

9    A    Yes, I did.

10    Q    Did you ask him why he failed to attend that

11 meeting?

12    A    Yes, I did.

13    Q    Do you recall what he said?

14    A    If I recall the meeting correctly, he made a --

15 he asked the question, what regulation, you know, required

16 him to attend, and I'd answered him in response that as

17 his supervisor, I directed him as a mandatory task to

18 attend.  That was the authority for his attending that

19 meeting.

20    Q    Take a look at Exhibit 4-J.

21    A    (Complying.)  Yes.

22    Q    Is that your memorandum, summarizing that

23 October 25 meeting that you had with the Appellant?

24    A    Yes, it is.

25    Q    Did you prepare it the same day?

53

1    that is quite large, but it only had two people in it.

2           And so one of the occupants, Mr. Lundgren, was

3    there, and I asked him if he had a problem with the file

4    cabinets being moved up, abutting his desk, and he said,

5    No, I have a partition to block the sound, and it doesn't

6    matter if it's a partition or a file cabinet. So he was

7    fine with the cabinets being moved in. So I left, and I

8    knew that the file cabinets were being moved in.

9           And then later Mr. Lundgren came down to my

10   office, and he said that Mr. Junaid was taking files out

11   of the cabinets and physically moving the cabinets by

12   himself, and I walked down to see what was going on. And

13   when I opened up the door, he was at the door with the

14   file cabinet, and I told him to stop. And then we had

15   words. He yelled at me, and I told him not to act like my

16   granddaughter, so --

17       Q     What did the Appellant yell at you?

18       A     To leave him alone, get out. Go get Mr. Cook,

19   if you want.

20       Q     And then what happened after that? What

21   happened next?

22       A     Well, he tried to close the door on me, and

23   that's when I told him not to even try to do that. But at

24   that point, I left and went down to the director's office

25   to try to find Mr. Cook.

*ON THE RECORD REPORTING*
*(512) 450-0342*

55

1    in the meeting.

2         Q       Was running the action register considered a
3    difficult task?

4         A       No.

5         Q       There was a home team meeting on October 6,
6    2010, and you attended that meeting. Is that right?

7         A       Yes.

8         Q       Okay. Did the Appellant come to that home team
9    meeting?

10        A       No.

11        Q       When you arrived at that meeting that morning,
12   what happened or what did you observe happening?

13        A       Well, when I walked in, Mr. Hogg was sitting at
14   the table, and I pointed at the computer, and I said, Mr.
15   Junaid, and I pointed at the facilitator's chair, and I
16   said, Jamie Lee. That was their function for that month,
17   and I said, But Jamie will not be here till 8:00, so it
18   will be a few minutes after. Our meeting was scheduled to
19   start at 8:00. I said, So it will be a few minutes after
20   when she will get here.

21              And he asked where Mr. Junaid was, and I just
22   shrugged my shoulder, and at that point, he said, I'll be
23   right back, and he left. The next in line after Jamie Lee
24   was Richard Medrano, so he started the meeting. I went
25   over to the computer to start the computer, but I couldn't

66

1       A     Yes, sir, I did.

2       Q     Did you receive also a written and an oral

3  reply with the Appellant?

4       A     Yes, I did.  Written and oral.

5              MR. MUIR:  I'm going to approach the witness,

6  Your Honor, and I'm going to show you what's been marked

7  as tab 4-F.

8              JUDGE WEISS:  Okay.

9              BY MR. MUIR:

10      Q     (Handing document.)  Mr. Braddy, was that the

11  Appellant's written reply?

12      A     Yes, sir.  It appears to be.  It was, as I

13  recall, about 90 pages, and this is a little over 90

14  pages.  Yes.  This is his written reply.

15      Q     Did you give full consideration to the

16  materials that were submitted to you by the Appellant?

17      A     Yes, I did.

18      Q     And you also held an oral reply meeting for the

19  Appellant.  Correct?

20      A     Yes.  In December of 2010.

21      Q     Was the Appellant accompanied by a union

22  representative?

23      A     He was.

24      Q     Did you take notes at that meeting?

25      A     I did.

215

1    A    Well, initially I said, Well, I don't think I

2    need to meet with you.  He said, well, he wants to discuss

3    the October 6 incident with me.  I said, I don't know what

4    incident you're talking about; I don't have any reason to

5    meet with you, and I don't have to be in your office.

6    Q    And you don't deny that you sent the email that

7    called him a racist and a bigot --

8    A    Oh, well, no.  I did send it, because his

9    actions speak louder than words, because when you punish

10   somebody acting on your behalf for going through the

11   regulations, doing exactly what they were supposed to do,

12   and saying he was insubordinate for something that he did

13   right, what can you call it?  It's discrimination; it's

14   racist.  So I called him a racist and a bigot.

15   Q    Now, Mr. Junaid, after you sent that email that

16   you said you weren't going to come to the meeting, what

17   happened?

18   A    Well, I sent it out, and I think I copied

19   several people, including you yourself, and you sent

20   email, said, Well, you need to meet with him, because that

21   would cause you, you know, problem in the future.  So I

22   said, Okay, I called the union office, and I talked to

23   Omar Walker.  I said, Listen, Gary Hogg wants to meet with

24   me.  This is the email, you know.  I didn't know why.  So

25   Omar Walker came with me, and we went and saw him in his

*ON THE RECORD REPORTING*
*(512) 450-0342*

216

1   office on October -- at two o'clock that day.

2       Q       Now, earlier in the morning on October 7, 2010,

3   at 11:13 a.m., Mr. Hogg says he came to your office.  Do

4   you remember that happening?

5       A       I was walking out, towards -- to go into the

6   restroom.  He was walking into my office.  I walked past

7   him.  I went and used the restroom.  If he said he was

8   waiting -- you know, he came to talk to me, even if I

9   walked past him, he could have waited till I came back and

10  said, Hey, I was waiting for you; I came to talk to you;

11  we have a problem.  But he didn't say -- I didn't listen

12  to what he was saying.

13          I was walking to the restroom.  He was walking

14  into my office.  It's a government office.  He's been to

15  my office several times while I was in there or while I

16  was not, because some employees have saw him open my

17  office, after being locked, you know, left and gone home,

18  opened my office, go inside my office, do whatever he

19  wants to do.  it's government property.  I don't have any

20  private property or anything in there, so I wasn't

21  concerned.  He was walking into my office.  I was walking

22  out.

23      Q       Now, at that time of morning, 11:13, October 7,

24  2010, did you have the intent to attend the two o'clock

25  meeting?

*ON THE RECORD REPORTING*
*(512) 450-0342*

247

1     A     (Complying.)  Okay.

2     Q     Okay, sir.  And that's the email that you sent

3  to Mr. Hogg on October 7, 2010, at 12:11 p.m.  Correct?

4     A     Correct.

5     Q     So you actually sent this email to Mr. Hogg

6  after the 11:13 meeting where he passed you in the

7  doorway.  Correct?

8     A     If I sent it at 12:11 p.m., yes.

9     Q     Right.  So it was actually -- you sent this

10  email after you already had that incident where you passed

11  Mr. Hogg in the doorway when he was coming in your office.

12  Correct?

13     A     Yes.  I was going to the restroom at that time.

14  Yes.

15     Q     Right.  And in this email, on the first

16  paragraph, the third sentence on that first paragraph, it

17  says -- and let me read it to you -- "There are two EEO

18  cases on my behalf against you pending and wish not to

19  appear in your sight for any reason until these cases are

20  resolved."

21     Now, sir, is that sentence there consistent

22  with what you just said, that you fully intended to go to

23  the two o'clock meeting?

24     A     Well, since I sent my lawyer information and I

25  sent it to Mr. Braddy also, my attorney said, Well, you

*ON THE RECORD REPORTING*
*(512) 450-0342*

253

1  on October 6, and I told him, There's nothing -- he didn't

2  speak to me on October 6.

3      Q     Did he tell you in the two o'clock meeting with

4  him on October 7 that it was perfectly fine if you didn't

5  show up at his meetings?

6      A     He didn't tell me that.  Omar Walker asked him,

7  he said if the meeting was mandatory, show us the

8  regulation that says the word "mandatory."  He couldn't

9  provide anything.

10     Q     So he did tell you the meeting was mandatory.

11 Right?

12     A     He told myself and Omar Walker.  That's -- the

13 meeting was mandatory; you didn't show up.  Omar Walker

14 asked him, Where is -- show us the regulation that says

15 the meeting was mandatory.

16          JUDGE WEISS:  I'm confused now, Mr. Junaid,

17 because I think you just said two different things there.

18 Did Mr. Hogg tell you the meetings were mandatory?  yes or

19 no?

20          THE WITNESS:  Yes, he did.

21          JUDGE WEISS:  Okay.  Go ahead.

22          BY MR. MUIR:

23     Q     Is it correct that you chose not to attend the

24 October 20, 2010, meeting?

25     A     Intentionally?  Normally the break time is

*ON THE RECORD REPORTING*
*(512) 450-0342*

254

1   between 8:00 and 8:15, according to regulations.   If I

2   don't wish to attend, I do not have to attend.

3        Q        So --

4        A        It's not mandatory to attend the meeting.

5        Q        So you made a decision not to attend the

6   October 20, 2010, meeting.   Correct?

7        A        I didn't make any decision.

8        Q        Did someone else --

9        A        I might not have attended the meeting.   That

10  doesn't say, I'm not going to attend the meeting.   I might

11  have a reason not to go to the meeting, but I didn't say,

12  I'm not going to attend the meeting.

13           JUDGE WEISS:   Hold on, Mr. Junaid.   Is the

14  reason that you didn't attend the meeting on October 20

15  because you didn't realize you had to, or because you just

16  decided not to?

17           THE WITNESS:   It's because I have a project

18  downstairs I need to work on, and I didn't have to attend

19  the meeting when I have a project downstairs to work on.

20           JUDGE WEISS:   Okay.   So you felt there was a

21  better use of your time.

22           THE WITNESS:   Correct.

23           JUDGE WEISS:   Okay.   Go ahead.

24           BY MR. MUIR:

25        Q        Now, sir, turn to Exhibit D, as in dog, and --

*ON THE RECORD REPORTING*
*(512) 450-0342*